NOS. 4-10-0504, 4-10-0583 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| SHAHID R. KHAN; ANN C. KHAN; SRK WILSHIRE INVESTMENTS, LLC; SRK WILSHIRE PARTNERS; SRK WILSHIRE INVESTORS, INC.; THERMOSPHERE FX PARTNERS, LLC; and KPASA, LLC, | ) ) ) ) ) | Appeal from Circuit Court of Champaign County No. 09L140 |
|        Plaintiff-Appellants, | ) | |
|        v.   (No. 4-10-0504) | ) | |
| BDO SEIDMAN, LLP; PAUL SHANBROM; MICHAEL COLLINS; EQUILIBRIUM CURRENCY TRADING, LLC; SAMYAK VEERA; GRANT THORNTON, LLP; GRAMERCY ADVISORS, LLC; JAY A. JOHNSTON; and MARC HELIE, | ) ) ) ) ) | |
|        Defendants, | ) | |
|        and | ) | |
| DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., d/b/a DEUTSCHE BANK ALEX. BROWN; and DAVID PARSE, | ) ) ) | |
|        Defendants-Appellees. | ) | |
| _____ | ) | |
| | ) | |
| SHAHID R. KHAN; ANN C. KHAN; SRK WILSHIRE INVESTMENTS, LLC; SRK WILSHIRE PARTNERS; SRK WILSHIRE INVESTORS, INC.; THERMOSPHERE FX PARTNERS, LLC; and KPASA, LLC, | ) ) ) ) ) | |
|        Plaintiffs-Appellants, | ) | |
|        v.   (No. 4-10-0583) | ) | |
| BDO SEIDMAN, LLP; PAUL SHANBROM; MICHAEL COLLINS; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., d/b/a DEUTSCHE BANK ALEX. BROWN; DAVID PARSE; EQUILIBRIUM CURRENCY TRADING, LLC; JAY A. JOHNSTON; and MARC HELIE, | ) ) ) ) ) ) | |
|        Defendants, | ) | |
|        and | ) | Honorable |
| GRANT THORNTON, LLP, | ) | Jeffrey B. Ford, |
|        Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion. Justices McCullough and Myerscough[1] concurred in the judgment and opinion.

**OPINION**

In these two consolidated appeals, the plaintiffs are Shahid R. Khan (Khan) and Ann C. Kahn along with various business entities that Khan formed for the purpose of creating artificial losses, which he hoped would reduce his taxable income. Khan was not the one who came up with the tax-avoidance schemes. Rather, according to the complaint, he followed the advice of Paul Shanbrom at BDO Seidman, LLP, advice that was reinforced by a variety of co-conspirators, including the defendants in these two appeals.

In one of the appeals, case No. 4-10-0504, the defendants are Deutsche Bank AG (Deutsche Bank); Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex. Brown (Brown); and David Parse, an employee of Deutsche Bank (collectively, Deutsche defendants). According to the complaint, Shanbrom and Parse advised Khan to engage in some "investment strategies" in 1999 and 2000 in order to create ordinary losses, and Deutsche Bank and Brown helped implement these strategies.

In the other appeal, case No. 4-10-0583, the defendant is Grant Thornton, LLP, which prepared the 2000 tax returns for one of the plaintiff corporations, Thermosphere FX Partners, LLC, claiming the fake losses. The Khans then used the information from this tax return in their own individual tax returns. The tax returns, however, were incorrect because, as the Internal Revenue Service (IRS) had warned in its

---

[1]Justice Myerscough registered her concurrence with this opinion before she resigned from the Appellate Court of Illinois, Fourth District, in order to be sworn in as a judge of the United States District Court, Central District of Illinois.

publications, such contrived losses lacked economic substance and therefore were not allowable. Consequently, plaintiffs ended up losing a lot of money. Not only were the substantial fees they paid to defendants a total waste, but plaintiffs incurred liability to the IRS for back taxes, interest, and penalties. All this is according to the complaint.

The Deutsche defendants moved to dismiss the complaint pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (735 ILCS 5/2-615, 2-619 (West 2008)), asserting the legal insufficiency of the complaint and also invoking the statute of limitations in section 13-205 of the Code (735 ILCS 5/13-205 (West 2008)). Grant Thornton likewise moved to dismiss the complaint on the grounds that it was legally insufficient and time-barred. The trial court concluded that the statute of limitations in section 13-205 barred the actions against the Deutsche defendants and that the statute of limitations in section 13-214.2(a) (735 ILCS 5/13-214.2(a) (West 2008)) and the statute of repose in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)) barred the actions against Grant Thornton. Therefore, the court granted defendants' motions for dismissal. The court also found, pursuant to Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010)), that there was no just reason to delay either enforcement or appeal of these rulings.

In our *de novo* review in these two appeals, taking the well-pleaded facts of the complaint to be true and drawing reasonable inferences in plaintiffs' favor, we hold that the trial court erred by concluding that the claims against defendants are time-barred. Therefore, we reverse the trial court's judgments in the two cases, and we remand the cases for further proceedings.

I. BACKGROUND

- 3 -

A. The 1999 Digital Options Strategy

1. *Shanbrom and Parse Pitch the Strategy to Khan*

Beginning in approximately 1993, BDO performed auditing services for Chromecraft, a company of which Khan was part owner. Michael Collins, a partner at BDO, was in charge of auditing services for Chromecraft, and as of 1999, he had been one of Khan's trusted accountants and advisors for some six years.

In 1999, Khan requested his own partner at Chromecraft to ask Collins if he knew anyone who could advise him on purchasing foreign currency. Khan needed Japanese yen because he was in negotiations to buy a Canadian company that manufactured plastic automobile bumpers and the Japanese owners of the company wanted to be paid in yen. Because Khan had no experience in foreign-currency trading, he needed guidance.

Collins referred Khan to Paul Shanbrom, who was a member of BDO's Tax Solutions Group and reputedly an expert in foreign-currency trading, and in September 1999, Khan and one of his estate-planning advisors had a meeting with Collins and Shanbrom. The meeting went beyond the subject of simply purchasing the needed foreign currency. Shanbrom introduced Khan to an "investment strategy" involving the purchase and sale of digital options on foreign currency (the Digital Options Strategy), a strategy which, according to Shanbrom, not only gave Khan a chance to double his money but also allowed him to claim a tax loss if he happened to lose money on his investments in foreign currency. Shanbrom told Khan that BDO had designed the Digital Options Strategy in such a way that it had economic substance for tax purposes. It purportedly had economic

substance because Khan had a good chance of making a substantial return. According to the complaint, "Khan did not understand the intricacies of the investments, the tax code or the mechanism that allowed him to receive the tax benefits; however, he trusted BDO's expertise in this area and their representations." In other words, Khan had only a vague idea of what the 1999 Digital Options Strategy was all about.

The "investment" part of the strategy involved the buying and selling of options in foreign currency. When someone buys an option, that person buys the right, but not the obligation, to buy or sell a given quantity of assets (in this case, foreign currency) at a fixed price, or "strike price," within a specified time, regardless of the market price, or "spot price," of the assets. (A "spot price" is the same thing as a "spot rate.") An option is "digital," or "binary," if the investor stands to win or lose a predetermined amount in full: in other words, the payout will be all of the predetermined amount or nothing (1 or 0, in binary terms). Essentially, a digital option is an all-or-nothing wager that the spot price will be at or above a given price on a certain date. Or it can be an all-or-nothing wager that the spot price will be at or below the given price on that date.

If the investor is betting that the spot price will be at or above the given price on a certain date, the investor has a long option. On the other hand, if the investor is betting that the spot price will be at or below the given price on a certain date, the investor has a short option.

Shanbrom recommended hiring David Parse of Deutsche Bank to assist Khan in acquiring these long and short options. Shanbrom arranged a conference call between himself, Parse, and Khan. In this conference call, Parse told Khan many of the same things

that Shanbrom had told him, including that the Digital Options Strategy was a good way to make money and, alternatively, a perfectly legal way to reduce taxable income. It was agreed that Deutsche Bank would handle the "investment" component of this strategy. Paragraph 63 of the complaint recounts the conference call as follows:

"During this conference call, Parse, along with Shanbrom, reiterated the 'sales pitch' and reassured Khan that the Digital Options Strategy was completely legal. Parse, along with Shanbrom, further discussed the steps of the Digital Options Strategy and informed Khan that Deutsche Bank would handle all aspects of the investments in foreign currencies. According to Parse, Deutsch [*sic*] Bank had internal procedures to determine the proper amounts and types of the foreign currency investments that would be appropriate for Khan's circumstances. Parse told Khan that Parse would make all decisions with respect to the amounts and types of foreign currency investments since he was the expert. Parse again reiterated that Plaintiffs would have a good chance of making a profit on the foreign currency investments. Parse represented to Khan that the foreign currency options that Khan would be executing were actual investments. Shanbrom and Parse never informed Khan that the foreign currency digital options were simply private bets with Deutsche Bank on

where the underlying currencies would be on a particular date and time and that Deutsche Bank controlled the outcome."

According to the complaint, Deutsche Bank controlled the outcome in that, as the "calculation agent," Deutsche Bank had the contractual right to accept or disregard any spot price. Presumably, Deutsche Bank's role as calculation agent was stated in the form contracts between Deutsche Bank and Khan (who signed them in his capacity as partner or corporate officer of various plaintiffs). Khan, however, did not understand the import of this designation of Deutsche Bank as calculation agent. He did not understand that Deutsche Bank's performance under the so-called "contract" amounted to little more than setting the dice on the table with Deutsche Bank's winning number facing upward. Footnote 12 of the complaint says:

> "[T]he FX Contracts [(another name for the digital options contracts)] were not something traded on any recognized exchange but were simply a matter of private contract between the participants. Finally, neither party had any right to take possession of the 'underlying currency.' As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a 'bet') based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties. Of course, the Plaintiffs were unaware of these aspects of the FX Contracts."

It would seem, then, that these transactions were not "investments" at all but

were merely rigged bets. Nevertheless, Parse referred to them as "investments." The complaint alleges that after the initial conference, Khan "had several additional telephone conversations with Parse in which Parse reiterated his prior statements and further discussed the purported 'investments.' "

2. *The Legal Opinion From Jenkens on the 1999 Digital Options Strategy*

According to the complaint, the Deutsche defendants were in a conspiracy with BDO to deceive clients such as Khan into paying large fees for the Digital Options Strategy, a strategy that was useless for tax purposes--indeed, worse than useless because the losses it generated were clearly illegitimate and claiming them was likely to result in some expensive liability to the IRS. Part of this conspiracy was to refer clients to an "independent law firm," Jenkens & Gilchrist, P.C. (Jenkens), to confirm the legality of the 1999 Digital Options Strategy. But Jenkens really was not independent. Paragraph 70 of the complaint alleges as follows:

"As part of their pre-planned conspiracy, the 1999 Strategy Defendants [(defined as BDO and the Deutsche defendants)] advised Plaintiffs that in the unlikely event the Internal Revenue Service ('the IRS') audited their tax returns as a result of the 1999 Digital Options Strategy, the Jenkens 'independent' opinion letter would confirm the propriety of the 1999 Digital Options Strategy and of claiming the resulting losses on Plaintiffs' tax returns. The 1999 Strategy Defendants and Jenkens--in furtherance of the conspiracy--further advised

- 8 -

Plaintiffs that this 'independent' opinion letter would enable the Plaintiffs to satisfy the IRS auditors as to the propriety of the tax returns. Unfortunately and unbeknownst to Plaintiff, Jenkens--with full knowledge of BDO and Deutsche--had already prepared the 'canned' and 'prefabricated' opinion letter approving the 1999 Digital Options Strategy and needed only to fill in several blanks prior to issuing the opinion letter to Plaintiffs."

In short, Jenkens was one of the co-conspirators, and its role in the conspiracy was to be the yes-man, issuing reassuring opinion letters that were not the product of an honest and conscientious legal analysis. The legal opinions by Jenkens were not specifically tailored to the client's particular financial situation "but were merely 'fill in the blank' boilerplate opinions provided to Plaintiffs as part of a 'pre-wired' scheme." Nevertheless, Jenkens collected a substantial fee from clients for these legal opinions. "In addition, Jenkens & BDO were involved in fee 'kickbacks' between themselves and with third parties who convinced clients to execute an Investment Strategy with Jenkens, Deutsche Bank, BDO, and others."

On Shanbrom's recommendation, Khan went to Jenkens, and on March 20, 2000, Jenkens issued to Khan an opinion letter confirming the legality of the 1999 Digital Options Strategy. Specifically, the letter opined that plaintiffs' " 'basis in their interest in the Partnership after contribution of the Options [would] include the cost of the Long Option contributed, without adjustment for the Short Option.' " (The significance of this

advice will soon be clear, when we explain how the 1999 Digital Options Strategy worked.) Jenkens further opined that " '[t]he step transaction, sham transaction, and economic substance doctrines [would] not apply to disallow the results of the transactions described herein.' " Further, according to Jenkens, IRS Notice 1999-59 (I.R.S. Notice 1999-59, 1999-2 C.B. 761), which warned against transactions lacking economic substance and having no apparent purpose other than to generate a fake capital loss, was simply " 'inapplicable to the transactions described here.' "

### 3. *Wanser's Affidavit*

In support of their combined motion for dismissal, Deutsche Bank and Brown submitted to the trial court an affidavit by one of their attorneys, Michael R. Wanser, and attached to that affidavit, as exhibits A through C, were copies of the form contracts Khan had signed with Deutsche Bank and Brown implementing the digital option trades. Exhibit A of Wanser's affidavit is a foreign-exchange digital-option transaction confirmation, dated November 29, 1999, between Wilshire Investments, LLC, and Deutsche Bank, signed by representatives of both companies. Paragraph 3 of exhibit A disclaims an agency relationship, a fiduciary relationship, and any reliance by the parties on advice or representations by the other party. The paragraph reads as follows:

"3. Representations

Each party represents to the other party that it is entering into this Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise) and that

(i) It has sufficient knowledge and

experience to be able to evaluate the appropriateness, merits and risks of entering into this Transaction and is acting in reliance upon its own judgment or upon professional advice it has obtained independently of the other party as to the appropriateness, merits and risks of so doing, including where relevant, upon its own judgement [*sic*] of the correct tax and accounting treatment of such Transaction;

(ii) It is not relying upon the views or advice of the other party (including, without limitation, any marketing materials or model data) with respect to this Transaction; and

(iii) It acknowledges that, with respect to this Transaction, the other party is acting solely in the capacity of an arm's length contractual counterparty and not in the capacity of financial adviser or fiduciary."

It would appear that insomuch as Parse, as an agent of Deutsche Bank, advised Khan that he could make a profit on the transaction, Parse gave "advice *** with respect to this Transaction." It also would appear that insomuch as Parse advised Khan that in the event he lost money on the transaction, he could claim the loss in his tax returns,

Parse likewise gave "advice *** with respect to this Transaction."  By signing exhibit A of Wanser's affidavit, Khan represented to Deutsche Bank that he was not relying on any such advice from Deutsche Bank (or its agent, Parse).

### 4. *Implementation of the 1999 Digital Options Strategy*

The 1999 Digital Options Strategy worked as follows.  The Khans entered into a private contract with Deutsche Bank whereby the Khans, through SRK Wilshire Investments (Wilshire Investments), bought from Deutsche Bank a long option on foreign currency and sold to Deutsche Bank a short option.  Thus, there came into existence an opposing pair of options, one long and the other short.  These options were designed to cancel each other out.  The strike prices of the two options were only a fraction of a penny apart, and the premium that the Khans paid Deutsche Bank for the long option, though large, was almost entirely offset by the premium Deutsche Bank agreed to pay the Khans for the short option (almost but not quite: the Khans paid a net premium to Deutsche Bank of $350,000, the difference between the $35 million that the Khans paid for the long option and the $34,650,000 that Deutsche Bank agreed to pay them for the short option).  Because the strike prices of the opposing options were so close together and because Deutsche Bank, as the calculation agent, had the right to select the applicable spot rate from a range of currency rates, it was a virtual certainty that the transaction would be close to a wash--Deutsche Bank would see to that.

So, pursuant to this scheme that was calculated to be a wash on the investment side (and, as we will explain, a loss on the tax side), the Khans formed the necessary business entities and transferred assets between them, all under the guidance of

- 12 -

BDO. On November 17, 1999, the Khans formed Wilshire Investments and SRK Wilshire Partners (Wilshire Partners). On November 24, 1999, through Wilshire Investments, the Khans bought and sold the opposing options, which had expiration dates of December 23, 1999. On November 26, 1999, Wilshire Investments contributed its interest in the as of yet unexpired options to Wilshire Partners as a capital contribution. On December 10, 1999, Wilshire Partners purchased a quantity of Canadian dollars as an investment. On December 23, 1999, both the long option and the short option terminated "out of the money": the options became worthless, based on the spot rate that Deutsche Bank chose. Of course, both the Khans and Deutsche Bank got to keep the premiums they had paid each other, but Deutsche Bank's premium was $350,000 greater than the premium it had paid to the Khans (or Wilshire Investments). On December 27, 1999, the Khans contributed their interest in Wilshire Partners to Wilshire Investments, causing the dissolution and liquidation of Wilshire Partners. As a distribution in liquidation of Wilshire Partners, all of the investments in foreign currency were distributed to Wilshire Investments.

Consequently, for tax purposes, the Khans' interest in Wilshire Investments had a basis equal to the amount they had paid to Deutsche Bank for the long option, but that amount supposedly was not offset as a result of the assumption by Wilshire Investments of the Khans' obligation to Deutsche Bank on the short option, perhaps on the theory that the short option was only a contingent liability (see *Stobie Creek Investments, LLC v. United States*, 82 Fed. Cl. 636, 666 (2008)). In other words, the long option counted for purposes of the basis the Khans had in Wilshire Investments, but the short

option, which greatly reduced the economic significance of the long option, supposedly did not count. Upon the disposition of the Khans' partnership interest in Wilshire Investments, the expensive long option had expired "out of the money" and had lost all its value, so the Khans claimed a tax loss equal to the premium they had paid for the long option, even though (because of the offsetting short option) they had not really incurred an economic loss in that amount.

5. *The Preparation and Filing of Plaintiffs' 1999 Income Tax Returns*

After the publication of IRS Notice 1999-59 on December 27, 1999, which warned against transactions lacking economic substance and having no apparent purpose other than to generate a fake capital loss, BDO prepared and signed plaintiffs' 1999 federal and state income-tax returns. Specifically, on April 1, 2000, BDO signed the 1999 federal tax returns for Wilshire Investments and Wilshire Partners, and on April 1, 2000, BDO signed plaintiffs' 1999 federal individual tax returns. These tax returns contained the losses supposedly generated by the 1999 Digital Options Strategy. Advising plaintiffs that the tax returns were "properly prepared in accordance with professional standards," BDO recommended that plaintiffs add their signatures to the returns and file them with the IRS. Plaintiffs did so, relying on the representations and assurances that defendants had made to them during the promotion, sale, and implementation of the 1999 Digital Options Strategy and also relying on the opinion letter from Jenkens, which, Shanbrom had assured Khan, would provide "absolute penalty protection." The filing of these returns was the final step of the 1999 Digital Options Strategy.

6. *The Publication of IRS Notice 2000-44*

On August 11, 2000, before plaintiffs filed their 1999 individual federal tax returns, the IRS published IRS Notice 2000-44 (I.R.S. Notice 2000-44, 2000-2 C.B. 255), entitled "Tax Avoidance Using Artificially High Basis" and describing transactions similar to those described in IRS Notice 1999-59, transactions that " 'purport[ed] to generate tax losses for taxpayers.' " In fact, one of the examples that IRS Notice 2000-44 gave closely resembled the Digital Options Strategy: the taxpayer purchased call options and simultaneously wrote (or sold) offsetting call options, transferred the option positions to a partnership, and claimed that the taxpayer's basis in the partnership interest was " 'increased by the cost of the purchased call options but [was] not reduced under [Internal Revenue Code] §752 as a result of the partnership's assumption of the taxpayer's obligation.' " IRS Notice 2000-44 warned that " '[t]he purported losses from these transactions (and from any similar arrangements designed to produce non-economic tax losses by artificially overstating basis in partnership interest) [were] not allowable as deductions for Federal income tax purposes.' "

## B. The 2000 COINS Strategy

### 1. *Shanbrom and Parse Pitch the 2000 COINS Strategy*

From his conversations with Khan, Shanbrom was aware of Khan's unhappiness that he had made no money in the foreign-currency market through the 1999 Digital Options Strategy (Khan did not understand that the options had been specifically designed to expire "out of the money"). So, in approximately June 2000, Shanbrom told Khan that BDO had developed another investment strategy, one that offered a better chance of making a profit. He introduced Kahn to the 2000 COINS Strategy (it is unclear what

"COINS" stands for, if it stands for anything).

As with the 1999 Digital Options Strategy, Shanbrom referred Khan to Deutsche Bank to execute the investment component of the 2000 COINS Strategy, telling him that "Parse and Deutsche Bank were the experts in foreign currency investments and they worked closely with BDO to implement this and other tax-advantaged strategies for BDO clients." Khan subsequently had several telephone conversations with Parse and Donna Guerin, a partner at Jenkens, and both of them "reiterated Shanbrom's representation that the foreign currencies digital options were designed in a way to provide Khan with a good chance of making a profit and at the same time legally reducing his taxes."

In reality, though, the 2000 COINS Strategy was not much different from the 1999 Digital Options Strategy. As the calculating party, Deutsche Bank still got to select the spot rate on expiration of the digital options. "The range of currency rates available to the calculating party [made] the selection of that spot rate subject to the pleasure of the calculating party." Consequently, it was exclusively the calculating party, Deutsche Bank, who determined whether a digital option paid out. Khan did not understand any of this. Instead, Shanbrom and Parse led him to believe, erroneously, that he could make a profit in the 2000 COINS Strategy. On the advice of Shanbrom and Parse, Khan decided to use this new moneymaking and tax-reducing strategy.

2. *Implementation of the 2000 COINS Strategy*

The 2000 COINS Strategy was merely a variation on the 1999 Digital Options Strategy. Here is how it worked. On September 29, 2000, using Deutsche Bank as the

counterparty, Wilshire Investments bought and sold offsetting pairs of options tied to foreign-currency exchange rates during specified periods in the future, with extremely close strike prices and a spot rate to be chosen by Deutsche Bank in its sole discretion. The cost of the long option, though large, was mostly (but not entirely) offset by the premium Wilshire received on the sale of the short option. On October 18, 2000, pursuant to the BDO's instructions, Wilshire Investments made a capital contribution of these option positions to a partnership formed specifically for purposes of the 2000 COINS Strategy, Thermosphere FX Partners, LLC (Thermosphere). Supposedly, the long option counted toward the basis, without any offset by the short option. On December 6 and 11, 2000, the strike prices on the opposing options were met, with the result that the gain on one option was, roughly speaking, matched by the loss on the other option. The options now were worthless, requiring an adjustment in plaintiffs' basis in Thermosphere. On December 15, 2000, Thermosphere purchased foreign currency. Plaintiffs requested to be redeemed out of Thermosphere, and on December 18, 2000, plaintiffs' entire capital balance was redeemed, and a portion of the foreign currency that Thermosphere had purchased was distributed to them. On December 27, 2000, plaintiffs sold the foreign currency and subsequently claimed an ordinary loss.

### 3. *The Legal Opinion From Jenkens on the 2000 COINS Strategy*

As with the 1999 Digital Options Strategy, Shanbrom told Khan that it would be necessary to obtain an "independent" legal opinion before actually implementing the 2000 COINS Strategy and using it in plaintiffs' income tax returns. According to Shanbrom, only two law firms had the necessary expertise and experience with this type

of investment strategy, either Sidley Austin LLP or Jenkens, and he advised Khan to select one of those two firms. Khan chose Jenkens because he had a prior relationship with Jenkens in connection with the 1999 Digital Options Strategy.

In January 2001, Shanbrom telephoned Khan and informed him that the legal opinion from Jenkens was ready. Shanbrom told Khan that he himself had reviewed the legal opinion and had made revisions to it (the complaint does not allege that Shanbrom is an attorney) and that with those revisions, the legal opinion was in final form and ready to go but that Khan would have to send Jenkens a check before Jenkens would release a copy of the legal opinion to Khan. Khan sent the check to Jenkens, and on January 12, 2001, Jenkens issued him an opinion letter confirming that the 2000 COINS Strategy was "a legal tax-advantaged investment strategy."

According to the opinion letter from Jenkens (as revised by Shanbrom), plaintiffs' basis in their interest in the partnership (Thermosphere), after their contribution of the options, would include the cost of the long option without adjustment for the short option. An adjustment to plaintiffs' basis would be required as a result of the termination of the options, and their disposition of the foreign currency that they had received in redemption of their partnership interest would result in an ordinary loss. The opinion letter asserted that " 'the alleged limitations of [IRS] Notice 2000-44 are more likely than not legally inapplicable to the [2000 Coins Strategy].' "

4. *The Preparation and Filing of Plaintiffs' 2000 Income-Tax Returns*

Grant Thornton, which allegedly was in the conspiracy with BDO and Deutsche Bank, prepared and signed the 2000 federal and state income tax returns for

Thermosphere. These tax returns claimed the artificial losses created by the 2000 COINS Strategy. These losses "flowed through" to the partners, *i.e.*, the Khans. See *Adler & Drobny, Ltd. v. United States*, 9 F.3d 627, 628 n.3 (7th Cir. 1993) ("A partnership return is a Form 1065. This form reports partnership gains and losses in a given taxable year. Form 1065 contains two additional documents that detail the partnership's financial activity: a Schedule K that computes the partnership's profit or loss and a Schedule K-1 that allocates the partnership's profit or loss among the partners. Because a partnership is not a taxable entity for federal income tax purposes, its profits and losses flow through to the partners where they are recognized for tax purposes on an individual basis.").

BDO prepared and signed the Khans' 2000 individual tax returns, both the federal and state returns, as well as the 2000 federal tax return for Wilshire Investments. The Khans' individual returns contained the losses from the 2000 COINS Strategy.

BDO and Grant Thornton assured Khan that the returns they had prepared were "properly prepared in accordance with professional standards" and that the losses generated by the 2000 COINS Strategy were legitimate and usable. On the basis of those assurances, the opinion letter from Jenkens, and defendants' advice during the promotion, sale, and implementation of the 2000 COINS Strategy, plaintiffs signed and filed the returns.

### 5. *The Tax Amnesty Program*

In late 2001 and early 2002, the IRS offered the "Tax Amnesty Program," a program in which taxpayers who had participated in illegal tax-avoidance schemes such as the 1999 Digital Options Strategy and 2000 COINS Strategy could voluntarily come

forward, disclose their involvement, and thereby avoid any penalties for their underpayment of taxes. BDO advised plaintiffs, however, not to participate in the amnesty program.

According to the complaint, it was for BDO's own benefit, rather than plaintiffs' benefit, that BDO steered plaintiffs away from the amnesty program. BDO wanted to avoid attracting any suspicion toward its tax department. If plaintiffs had talked to the IRS, the IRS would have launched an investigation of BDO and would have required BDO to disclose the names of all its clients who had used the Digital Options Strategy or anything similar to it.

### 6. *The IRS Audit*

In 2003 and 2004, plaintiffs received notices of audit from the IRS for their 1999-2001 tax returns. In May 2003, they hired counsel to represent them in the audit.

### 7. *The IRS Disallows the Losses Created by the 1999 Digital Options Strategy and the 2000 COINS Strategy*

In 2008, the IRS disallowed the losses created by the 1999 Digital Options Strategy and the 2000 COINS Strategy, concluding that the transactions lacked economic substance. As a result, plaintiffs not only lost the benefit of the considerable fees and premiums they had paid to defendants in connection with the 1999 Digital Option Strategy and the 2000 COINS Strategy, but the IRS also determined that plaintiffs owed a large amount of back taxes, interest, and penalties as a consequence of plaintiffs' claiming the invalid losses.

## II. ANALYSIS

### A. Case No. 4-10-0504 (the Deutsche Defendants)

## 1. *The Trial Court's Reason for Dismissing the Complaint*

On September 28, 2009, pursuant to sections 2-615 and 2-619 of the Code (735 ILCS 5/2-615, 2-619 (West 2008)), Deutsche Bank and Brown filed a motion to dismiss the complaint. On October 2, 2009, Parse likewise filed a motion to dismiss the complaint pursuant to those two sections.

Section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2008)) permits a combined motion for dismissal pursuant to sections 2-615 and 2-619 (735 ILCS 5/2-615, 2-619 (West 2008)), but section 2-619.1 says that "[a] combined motion *** shall be in parts" and that "[e]ach part shall be limited to and shall specify that it is made under one of [s]ections 2-615, 2-619, or 2-1005." 735 ILCS 5/2-619.1 (West 2008). Defendants' motions for dismissal are not divided into parts as section 2-619.1 requires. Nevertheless, the memorandum that Deutsche Bank and Brown filed in trial court in support of their motion for dismissal is divided into parts: the first part corresponding to section 2-619 and the second part corresponding to section 2-615. Under the heading of section 2-619, Deutsche Bank and Brown invoke the statute of limitations in section 13-205 (735 ILCS 5/13-205 (West 2008)), and under the heading of section 2-615, they challenge the claims for breach of fiduciary duty (count I), negligence (count II), negligent misrepresentation (count III), disgorgement (count IV), rescission (count V), declaratory judgment (count VI), breach of contract (count VII), fraud (count VIII), consumer fraud (count IX), and civil conspiracy (count XI). We assume that Parse intended his motion for dismissal to follow the same structure.

This structure was, as we have noted, a dual structure--one part

corresponding to section 2-615 (735 ILCS 5/2-615 (West 2008)) and the other part corresponding to section 2-619(a)(5) (735 ILCS 5/2-619(a)(5) (West 2008))--and it appears, from the transcript of the hearing of December 3, 2009, that the trial court granted defendants' motions for dismissal under section 2-619 instead of section 2-615. The court stated: "[U]nder section 2-619(a)9 [*sic*], the motions to dismiss for statute of limitations should be allowed." Granting a combined motion for dismissal under section 2-619 rather than section 2-615 is a coherent ruling, considering that a statute of limitations is an affirmative defense (*Wise v. Potomac National Bank*, 393 Ill. 357, 366, 65 N.E.2d 767, 771 (1946)) and that by raising an affirmative defense, a party admits the legal sufficiency of the complaint while asserting affirmative matter that avoids or defeats the plaintiff's claim (*Van Meter v. Darien Park District*, 207 Ill. 2d 359, 367, 799 N.E.2d 273, 278 (2003)). Invoking a statute of limitations presupposes that the plaintiff has pleaded a cause of action, because there is no occasion for considering the staleness of the action unless a cause of action has been pleaded. Nonetheless, because we can affirm a judgment for any reason the record supports, even if the trial court never relied on that reason (*Holtkamp Trucking Co. v. David J. Fletcher, M.D., L.L.C.*, 402 Ill. App. 3d 1109, 1115, 932 N.E.2d 34, 40 (2010)), we will assess the legal sufficiency of the complaint under section 2-615 as well as consider, under section 2-619(a)(5) (735 ILCS 5/2-619(a)(5) (West 2008)), whether the action was "commenced within the time limited by law."

2. *The Legal Sufficiency of Count I (Breach of Fiduciary Duty)*

a. Our Standard of Review

In their brief, plaintiffs defend the legal sufficiency of count I (breach of

fiduciary duty) and count III (negligent misrepresentation). Therefore, we will consider *de novo* whether plaintiffs pleaded a cause of action for breach of fiduciary duty and negligent misrepresentation. See *Ford v. Walker*, 377 Ill. App. 3d 1120, 1124, 888 N.E.2d 123, 127 (2007). A *de novo* review entails performing the same analysis a trial court would perform. That is, we accept all well-pleaded facts in the complaint as true while disregarding legal or factual conclusions unsupported by allegations of fact. *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 339 Ill. App. 3d 177, 182, 790 N.E.2d 925, 929 (2003). From the well-pleaded facts, we draw inferences in the plaintiff's favor whenever it would be reasonably defensible to do so. *Id.*

Viewing the well-pleaded facts in a light most favorable to the plaintiff, we decide whether the plaintiff has pleaded sufficient facts to constitute a cause of action (*Goldman*, 339 Ill. App. 3d at 182, 790 N.E.2d at 929), and in answering that question, we confine ourselves to (1) the allegations in the complaint and (2) matters of which we may take judicial notice. *Kirchner v. Greene*, 294 Ill. App. 3d 672, 677, 691 N.E.2d 107, 112 (1998). For purposes of section 2-615 (735 ILCS 5/2-615 (West 2008)), it is improper to consider " 'affidavits, affirmative factual defenses or other supporting materials.' " *Id.* (quoting *Oravek v. Community School District 146*, 264 Ill. App. 3d 895, 898, 637 N.E.2d 554, 557 (1994)).

b. The Affidavit By Wanser

In the memorandum that Deutsche Bank and Brown submitted to the trial court in support of their combined motion for dismissal, one of the headings was, "Each of Plaintiffs' Claims Fails as a Matter of Law and Should Be Dismissed Pursuant to 735 Ill.

Comp. Stat. 5/2-615." Under that heading--which challenged the *legal sufficiency* of plaintiffs' claims--Deutsche Bank and Brown referred to an affidavit by one of their attorneys, Michael R. Wanser. The affidavit in turn referred to some contractual documents attached to the affidavit as exhibits A through C. This affidavit and its exhibits, however, were not attached to plaintiffs' complaint. Rather, Deutsche Bank and Brown filed the affidavit, with its attached exhibits, at the same time they filed their motion for dismissal and supporting memorandum. In a footnote of their memorandum, Deutsche Bank and Brown argued: "The Court may consider these documents [(*i.e.*, Wanser's affidavit and exhibits)] on this motion to dismiss without converting the motion to one for summary judgment because they are explicitly referred to in the Complaint, *see e.g.*, Comp. ¶¶ 82, 248. *See Kirchner v. Greene*, 294 Ill. App. 3d 672, 677 (1st Dist. 1998) (permitting defendants to raise arguments in their 5/2-615 motion related to documents discussed and quoted in plaintiffs' complaint)."

It is true that paragraph 82 of the complaint referred to "a set of private contracts with Deutsche Bank involving foreign currency digital options on Japanese Yen" and that paragraph 248 of the complaint referred to "Engagement Agreements." Nevertheless, the complaint did not quote or so much as mention the particular contractual provisions on which Deutsche Bank and Brown relied in support of their motion to dismiss the complaint for failure to state a cause of action. For that very reason, *Kirchner* actually afforded no authority for the consideration of Wanser's affidavit. *Cf. Kirchner*, 294 Ill. App. 3d at 678, 691 N.E.2d at 113 ("The record reveals that defendants' section 2-615 motion to dismiss and memorandum in support of the motion directly linked their statements and

arguments to the allegations in plaintiffs' complaint, the five newspaper columns attached as exhibits to plaintiffs' complaint and the Illinois Supreme Court decisions that are not only mentioned, but are discussed and quoted, in plaintiffs' complaint. *** *[T]he instant defendants, in their motion to dismiss, did not attach or rely upon any matters outside the pleadings ***.*") (Emphasis added.) Indeed, for purposes of a section 2-615 motion, *Kirchner* flatly forbade the consideration of " 'affidavits, affirmative factual defenses or other supporting materials.' " *Kirchner*, 294 Ill. App. 3d at 677, 691 N.E.2d at 112 (quoting *Oravek*, 264 Ill. App. 3d at 898, 637 N.E.2d at 557).

Nonetheless, on appeal, plaintiffs do not argue that the trial court's consideration of Wanser's affidavit and exhibits was procedurally improper. Instead of challenging the affidavit on procedural grounds, plaintiffs make substantive arguments against it. Therefore, any procedural objection to the affidavit and its exhibits would be forfeited. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008) ("Points not argued are waived," *i.e.*, forfeited.).

That leaves the difficult question of how we should go about performing our analysis under section 2-615 (735 ILCS 5/2-615 (West 2008)). On the authority of *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 86 (1996), plaintiffs insist that notwithstanding Wanser's affidavit, we should "accept as true all well-pleaded facts in the complaint and all reasonable inferences which can be drawn therefrom" and that we should "interpret the allegations of the complaint in the light most favorable to the plaintiff[s]."

Plaintiffs are correct that under section 2-615, Wanser's affidavit cannot negate the well-pleaded facts of the complaint. Even if the exhibits of Wanser's affidavit

were actually attached to the complaint as exhibits, they would not trump the factual allegations in the complaint, because an exhibit of a complaint trumps the allegations in the complaint only if the exhibit is an instrument upon which the claim is founded. See 735 ILCS 5/2-606 (West 2008). " 'When the exhibit is not an instrument upon which the claim or defense is founded but, rather, is merely evidence supporting the pleader's allegations, the rule that the exhibit controls over conflicting averments in the pleading is inapplicable.' " *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 432, 804 N.E.2d 519, 531-32 (2004) ( quoting *Garrison v. Choh*, 308 Ill. App. 3d 48, 53, 719 N.E.2d 237, 241 (1999)). A claim is founded on an instrument only if the claim is "based on" the instrument or only if the plaintiff is "suing upon" the instrument. *Garrison*, 308 Ill. App. 3d at 53, 719 N.E.2d at 240-41.

Plaintiffs' claim for breach of fiduciary duty is not founded on the contractual documents. We know that much from a case that defendants cite in their brief, *Armstrong v. Guigler*, 174 Ill. 2d 281, 673 N.E.2d 290 (1996). In *Armstrong*, 174 Ill. 2d at 293-94, 673 N.E.2d at 296, the supreme court said: "A breach of an implied fiduciary duty is not an action *ex contractu* simply because the duty arises by legal implication from the parties' relationship under a written agreement. In fact, a fiduciary relationship is founded on the substantive principles of agency, contract *and* equity." (Emphasis in original.) If, as the supreme court says, an action for breach of fiduciary duty does not arise out of the contract, plaintiffs' action for breach of fiduciary duty is not founded on the contractual documents, and the contractual documents attached to Wanser's affidavit would not override the factual allegations of the complaint even if the documents were attached to the complaint

- 26 -

as exhibits. Therefore, we will take all of the well-pleaded facts of the complaint to be true even if the disclaimer in exhibit A of Wanser's affidavit appears to contradict those facts by stating that there is no agency, no fiduciary relationship, and no reliance on Deutsche Bank's advice.

c. Choosing Between Illinois Law and New York Law

The parties disagree on which state's law applies to the determination of whether defendants owed plaintiffs a fiduciary duty: the law of Illinois or the law of New York. The contractual documents attached to Wanser's affidavit choose New York law. Specifically, paragraph 4 of the confirmation agreement, dated November 29, 1999, between SRK Wilshire Investments, LLC, and Deutsche Bank (exhibit A of Wanser's affidavit) provides that "the governing law is New York law." Likewise, the account agreements dated November 18, 1999, between the Wilshire entities and BT Alex. Brown, Inc. (exhibit C of the affidavit), provide: "This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof." (We assume that BT Alex. Brown, Inc., is the same corporation as one of the named defendants in this case, Deutsche Bank Securities, Inc., doing business as Deutsche Bank Alex. Brown; none of the parties suggest otherwise.)

We should give effect to a choice-of-law provision in a contract (*Hofeld v. Nationwide Life Insurance Co.*, 59 Ill. 2d 522, 529, 322 N.E.2d 454, 458 (1975)) unless the contract chooses a foreign law that is " 'dangerous, inconvenient, immoral, [or] contrary

- 27 -

to the public policy of the local government' " (*Potomac Leasing Co. v. Chuck's Pub, Inc.*, 156 Ill. App. 3d 755, 757-58, 509 N.E.2d 751, 753 (1987) (quoting *McAllister v. Smith*, 17 Ill. 328, 334 (1856))). Because we are unaware that any of those objections could be made against New York law, we will give effect to the contractual choice of New York law insomuch as this case requires us to interpret and apply exhibits A through C of Wanser's affidavit. See *Reighley v. Continental Illinois National Bank & Trust Co. of Chicago*, 390 Ill. 242, 249, 61 N.E.2d 29, 33 (1945).

This is not to say that we otherwise will ignore New York law, such as when evaluating the parties' legal relationship that predated the execution of these contracts. Binding or not, New York case law provides useful guidance on the fiduciary duties of brokers and investment advisors.

#### d. The Fiduciary Duty of a Broker To Give Competent, Honest Advice Regarding the Purchase or Sale of Securities, Insomuch as the Broker Chooses To Give Such Advice

As plaintiffs argue, if we take the well-pleaded facts of the complaint to be true and draw reasonable inferences from those facts (*Bryson*, 174 Ill. 2d at 86, 672 N.E.2d at 1213), defendants had an understanding, a relationship, with Khan that predated the execution of exhibits A through C of Wanser's affidavit. It appears that in 1999, before the parties signed any documents implementing any particular transactions, Shanbrom, Parse, and Khan had a conference, in which Shanbrom and Parse pitched the 1999 Digital Options Strategy to Khan. One could infer that in this conference, Shanbrom and Parse invited Khan to trust them in the realms of foreign-currency option trading and federal income taxation and that Khan gave them his trust, with the result that he was persuaded, repeatedly, to put large sums of money into their hands for investment. Again, paragraph

63 of the complaint alleges as follows:

> "Shanbrom set up a conference call between himself, Parse, and Khan to discuss foreign currency trading. During this conference call, Parse, along with Shanbrom, reiterated the 'sales pitch' and reassured Khan that the Digital Options Strategy was completely legal. Parse, along with Shanbrom, further discussed the steps of the Digital Options Strategy and informed Khan that Deutsche Bank would handle all aspects of the investments in foreign currencies. According to Parse, Deutsche Bank had internal procedures to determine the proper amounts and types of the foreign currency investments that would be appropriate for Khan's circumstances. Parse told Khan that Parse would make all decisions with respect to the amounts and types of foreign currency investments since he was the expert. Parse again reiterated that Plaintiffs would have a good chance of making a profit on the foreign currency investments."

Thus, Shanbrom and Parse, who was an agent of Deutsche Bank, led Khan to believe that his trading in foreign currencies *via* Deutsche Bank would be an "investment." An "investment," of course, is the expenditure of money for the purpose of making a profit. New Oxford American Dictionary 893 (2001). Parse "reiterated that Plaintiffs would have a good chance of making a profit on the foreign currency

investments."  Evidently, Deutsche Bank was to serve as Khan's broker for purposes of trading in foreign currencies. And in the contemplation of the parties, Deutsche Bank's role would not be the robotic execution of whatever instructions originated with Khan.  Far from it, Parse, who was "the expert," "would make all decisions with respect to the amounts and types of foreign currency investments," using Deutsche Bank's "internal procedures" for deciding such matters.

And Deutsche Bank's advice to Khan went further than the amounts and types of foreign-currency investments.  According to the complaint, the "1999 Strategy Defendants"--defined as BDO, Deutsche Bank, Brown, and Parse--also advised Khan on how the contemplated foreign-currency trading could be used to reduce plaintiffs' federal income taxes through the creation of a large capital loss, should plaintiffs fail to make a profit on the foreign-currency investments.  Paragraphs 68 and 69 of the complaint allege as follows:

"68. The 1999 Strategy Defendants advised Plaintiffs that the basis of Plaintiffs' interest in the partnership [(SRK Wilshire Partners)] would be increased for tax purposes by the purchase cost of the long options, but not decreased by the premium earned by Plaintiffs on the short options.  The 1999 Strategy Defendants further advised Plaintiffs that upon the contribution of the partnership interest to the S Corporation [(SRK Wilshire Investors, Inc.)] and the subsequent sale by the S Corporation of its assets, the S Corporation would realize a

large capital loss that could be applied to substantially reduce or eliminate the large capital gains realized by Plaintiffs, thus substantially reducing or even eliminating the Plaintiffs' tax liability.

69. The 1999 Strategy Defendants informed Plaintiffs that depending on the exchange rate between the U.S. dollar and the foreign currencies involved in the digital option transactions, there was a reasonable chance of realizing a pre-tax gain on the FX Contracts. The 1999 Strategy Defendants assured Plaintiffs that in the event Plaintiffs lost money on the FX Contracts, the tax benefits of the 1999 Digital Options Strategy as a whole, resulting from the creation of losses to offset gains and/or income, far outweighed any losses that might be incurred as a result of the FX Contracts."

According to the complaint, this advice was misleading in two ways. First, the "investment" in foreign currencies was not really an investment at all. Rather, the transaction was designed as a sure-fire way for plaintiffs to lose money to Deutsche Bank. Unbeknownst to Khan, "the foreign currency digital options were simply private bets with Deutsche Bank on where the underlying foreign currencies would be on a particular date and time," and "Deutsche Bank controlled the outcome" in these bets by choosing the spot rate (we are quoting paragraph 63 of the complaint). According to footnote 12 of the complaint, the "transactions" with Deutsche Bank were "[not] even transactions. *** [T]he

FX [(foreign exchange)] Contracts were not something traded on any recognized exchange but were simply a matter of private contract between the participants. Finally, neither party had any rights to take possession of the 'underlying currency.' As a result, the FX Contracts amounted, in actuality, to a contractual wager (*i.e.*, a 'bet') based on movements in foreign currency prices, without any real possibility of foreign currency ever changing hands between the parties." In other words, instead of making an "investment," as Parse and Shanbrom represented he would be doing, Khan would be the predestined loser in a rigged bet. Second, defendants' advice to Khan was additionally misleading in that the capital loss they promised in the event that plaintiffs lost money in the foreign-currency "investments" would be indefensible under IRS Notice 1999-59.

      This negligent or dishonest advice, which Parse allegedly gave Khan at the inception of their relationship, distinguishes the present case from a case on which the Deutsche defendants rely, *De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002), in which the Second Circuit held that a broker had no duty to give a nondiscretionary customer *ongoing* advice in between transactions (*De Kwiatkowski*, 306 F.3d at 1307). It is true that like the plaintiff in *De Kwiatkowski*, Khan had a "nondiscretionary" account in that Deutsche Bank and Brown executed only those trades specified in documents signed by the customer. It also is true that, absent other facts, the only fiduciary duty a broker owes a nondiscretionary customer is to faithfully and competently execute the requested trade and that once the broker does so, the fiduciary duty ends. *Id.* at 1302. "[A] broker ordinarily has no duty to monitor a nondiscretionary account, or to give advice to such a customer on an *ongoing* basis. The broker's duties

- 32 -

ordinarily end after each transaction is done, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments." (Emphasis added.) *Id.* The Second Circuit was careful to add, however, that a broker was "obliged to give honest and complete information when recommending a purchase or sale." *Id.* See also Restatement (Second) of Torts §552(1) (1977).

In short, although the broker's provision of advice triggered no ongoing duty to give more advice after the transaction was accomplished (*De Kwiatkowski*, 306 F.3d at 1302), the advice that the broker gave in the first place had to be honest and competent (*id.* at 1306, 1308)--and that is an important qualification for purposes of the present case. See also *Rasmussen v. A.C.T. Environmental Services Inc.*, 739 N.Y.S.2d 220, 222 (N.Y. App. Div. 2002) (as an investment advisor, the defendant was in a position of trust and owed the decedent a fiduciary duty); *Ascot Fund Ltd. v. UBS PaineWebber, Inc.*, 814 N.Y.S.2d 36, 36 (N.Y. App. Div. 2006) ("PaineWebber, as a broker, owed no fiduciary duty to plaintiff purchaser of securities [citations]. *There is no evidence that the simple broker-customer relationship here included any investment advice given by PaineWebber***.*" (emphasis added)); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d 79, 102 (S.D.N.Y. 2004) ("New York courts have found fiduciary relations between clients and investment banks where there is either a confidence reposed which invests the person trusted with an advantage in treating the person so confiding [citation], or an assumption of control and responsibility. [Citations.]" (internal quotation marks omitted)).

Granted, in addition to accusing the Deutsche defendants of giving bad initial advice, plaintiffs accuse them of failing to give further advice. Plaintiffs blame defendants

not only for their initial advice to engage in the 1999 Digital Options Strategy and 2000 COINS Strategy but also for their subsequent failure to advise plaintiffs to participate in the amnesty program that the IRS offered in late 2001 and early 2002. But this further advice would have been *corrective* advice and in that respect would have been significantly different from the ongoing advice that the plaintiff in *De Kwiatkowski* unreasonably expected from his broker. The plaintiff in *De Kwiatkowski* contended that after the broker followed his instructions by executing the foreign-currency transactions, his broker had an ongoing duty to keep him apprised of geopolitical developments and other changing circumstances that might cause the value of the dollar to fall. *De Kwiatkowski*, 306 F.3d at 1300, 1301. As the Second Circuit explained, such a duty would have been unreasonably burdensome for a broker and virtually impossible to fulfill. *Id*. at 1303. In the present case, by contrast, when plaintiffs argue that defendants had a subsequent duty to advise them to participate in the amnesty program, plaintiffs are expressing the more reasonable proposition that defendants had a duty to come clean before plaintiffs suffered further financial harm from defendants' earlier negligent or dishonest advice.

e. Confidence Reposed on One Side and Resulting Influence on the Other Side

A confidential or fiduciary relationship exists "where one party reposes special trust and confidence in another who accepts that trust and confidence and thereby gains superiority and influence over the subservient party." *Eldridge v. Eldridge*, 246 Ill. App. 3d 883, 889, 617 N.E.2d 57, 62 (1993). See also *Penato v. George*, 383 N.Y.S.2d 900, 904 (N.Y. App. Div. 1976) ("Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said

that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed."). Deutsche Bank and Brown insist that such a relationship of trust and confidence cannot arise "in ordinary business relationships," and they quote a federal decision to that effect: "[A] conventional business relationship, without more, does not become a fiduciary relationship by mere allegation. [Citation.] Indeed, *New York Courts have rejected the proposition that a fiduciary relationship can arise between parties to a business transaction* [citation], and have concluded that where parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." (Emphasis added.) (Internal quotation marks omitted.) *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 426 (S.D.N.Y. 1992).

When the district court says, however, that no fiduciary relationship can arise between parties to a "business transaction," the court evidently means, in this context, an "arm's-length business transaction." For, actually, it is quite common for a fiduciary relationship to arise in a business transaction--if the transaction creates an agency relationship, for example (see Restatement (Third) of Agency §1.01 (2006)), such as that between an attorney and client (*Eldridge*, 246 Ill. App. 3d at 889), employer and employee (*Alpha School Bus Co. v. Wagner*, 391 Ill. App. 3d 722, 737-38, 910 N.E.2d 1134, 1150 (2009)), or broker and client (*Barry Mogul & Associates, Inc. v. Terrestris Development Co.*, 267 Ill. App. 3d 742, 749, 643 N.E.2d 245, 251 (1994)). The question really is not the presence or absence of commerce in the creation of the agency relationship. Rather, the

question is, Did A repose a special trust and confidence in B, and did B accept that trust and confidence and thereby gain superiority and influence over A? *Eldridge*, 246 Ill. App. 3d at 889, 617 N.E.2d at 62.

Looking at the well-pleaded facts of the complaint in a light most favorable to plaintiffs, one could reasonably infer that Khan reposed special trust and confidence in defendants and that they thereby gained superiority and influence over him. After all, Deutsche Bank was a prestigious investment bank, highly sophisticated in its field and capable, by its very name, of inspiring confidence. It is true that Khan was wealthy, apparently, but he was not Deutsche Bank. As Parse told Khan, Deutsche Bank had "internal procedures" for determining the exact amounts and types of foreign currency that would be just right for him. Khan knew little about foreign-currency trading and federal income-taxation, whereas defendants were self-proclaimed experts in those subjects, each of which was a labyrinth in itself. Defendants promised to lead Khan by the hand through these forbidding labyrinths. Using his special expertise and Deutsche Bank's internal procedures, Parse would decide the types and amounts of foreign currency in which plaintiffs would invest. One might infer, therefore, that the figures in the contracts came from Parse, not from Khan. All in all, one could get the impression that Khan was considerably out of his element and that he more or less was told where to sign. Considering that he thought he was making "investments," he evidently understood little about the 1999 Digital Options Strategy and the 2000 COINS Strategy. Nevertheless, in blind or uncomprehending faith in the "experts," he took the plunge more than once. Shanbrom and Parse must have had considerable influence over him, because even though

he lost a substantial amount of money in the 1999 Digital Options Strategy, he was fully prepared, on their advice, to risk another drubbing in the 2000 COINS Strategy. But, then, as they assured him, it ultimately did not matter if he lost money in the transactions, because, in the end, he would come out ahead in tax losses.

f. The Contractual Disclaimers, Voidable Without Full Disclosure of All Material Facts

As we have observed, the confirmation agreements between plaintiffs and Deutsche Bank contain a paragraph, entitled "Representations," in which the parties represent to each other that they are entering into the transactions as principal, not as agent or fiduciary, and that they are not relying on the advice of the other party. Defendants cite cases holding that a contractual disclaimer of representations makes reliance on precontractual representations unreasonable (*Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959); *Chase Manhattan Bank v. New Hampshire Insurance Co.*, 759 N.Y.S.2d 17, 19 (N.Y. App. Div. 2003); *First City National Bank & Trust Co. v. Heaton*, 563 N.Y.S.2d 783, 784 (N.Y. App. Div. 1990); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729, 736 (2d Cir. 1984); *Adams v. Intralinks, Inc.*, 2004 WL 1627313, at *7 (S.D.N.Y. July 20, 2004); *Conopco, Inc. v. Imperial Chemical Industries PLC*, 1999 WL 1021077, at *4 (S.D.N.Y. Nov. 8, 1999)) and that a contractual disclaimer of a fiduciary relationship prevents the formation of a fiduciary relationship (*Conwill v. Arthur Andersen LLP*, 820 N.Y.S. 2d 842 (N.Y. Sup. Ct. 2006) (table); *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004)). Nevertheless, none of those cases appear to hold that a contractual disclaimer of representations and of a fiduciary relationship allows a party to flee the duties of a fiduciary relationship that came

into existence before the parties signed the contract.

The parties in *Danann*, for example, had no preexisting fiduciary relationship; they were simply the buyer and seller of a lease. The defendants were the lessees of a building, and pursuant to a written contract, the plaintiff bought the lease from them. *Danann*, 157 N.E.2d at 598. After the sale, the plaintiff sued the defendants for fraud on the ground that they had induced him to buy the lease by making oral misrepresentations to him regarding the operating expenses of the building and the profits that could be made from the investment. *Id.* Nevertheless, the written contract stipulated that the defendants had made no representations about the rent, expenses, or any other matter relating to the premises and that neither party was relying on any representation made by the other party. *Id.* at 598-99. The Court of Appeals of New York held, as a matter of law, that the plaintiff could not justifiably rely on the very same representations on which he had disclaimed reliance in the written contract. *Id.* at 600. The no-representation clause therefore destroyed an essential element of a cause of action for fraud: justifiable reliance. *Id.*

On the authority of *Danann*, the Deutsche defendants insist that plaintiffs likewise are bound by the disclaimer in the confirmation agreement with Deutsche Bank. New York case law, however, holds the rationale of *Danann* to be inapplicable to parties who are in a fiduciary relationship. See *Littman v. Magee*, 860 N.Y.S. 2d 24, 29 (N.Y. App. Div. 2008) (distinguishing *Danann* on the ground that "*Danann* involved an arm's length business transaction, and there was no fiduciary duty between the parties, so no obligation on the defendant in that matter to disclose all material facts bearing on the transaction").

Arguably, Parse first established a fiduciary relationship with Khan--he first had a conference with Khan and follow-up telephone conversations with him, in which he gained Khan's special trust and confidence--and then he obtained Khan's signature on the contractual documents through that trust and confidence. With the help of Khan's trusted accounting firm, Parse first established an "unofficial" fiduciary relationship with Khan, and once Khan accepted Parse's investment advice in that "unofficial" relationship, Parse obtained Khan's signature on the contractual documents, which, in their disclaimer clause, sought to establish an "official" arm's-length relationship with Khan. By the disclaimer in the contractual documents, Deutsche Bank sought to retain the influence of a fiduciary without the responsibilities of one. Before presenting Khan with any documents, however, Deutsche Bank agreed to be his broker, and in that capacity, Deutsche Bank gave him investment advice, which Khan accepted on trust, even though this advice called for his expenditure of hundreds of thousands of dollars. Deutsche Bank thereby entered into a fiduciary relationship with Khan, which cannot be so easily subverted by a subsequent boilerplate disclaimer.

To drive home what we mean, consider this analogy. Assume that someone--let us call him John Doe--confers with an attorney. Doe has never spoken with this attorney before. He just walks into the attorney's office and tells the attorney his legal problem. The two have a conversation, in which the attorney orally agrees to represent Doe and recommends to him a course of action to address his legal problem. Doe, who possesses no legal expertise, places his trust in this attorney and agrees to the suggested course of action: he accepts the attorney's advice and consents to what the attorney

proposes doing in his behalf. Assume further that the attorney then obtains Doe's signature on a retainer agreement containing a disclaimer clause. In the disclaimer clause, Doe represents to the attorney (despite the discussion they have just had) that he is not relying on the attorney's advice regarding this particular legal problem and that he and the attorney are not in an agency relationship or a fiduciary relationship. Few would dispute that the disclaimer clause is itself an abuse of trust, and it is an abuse of trust because it is a sham, it is misleading--and it is misleading in the service of the attorney who supposedly was going to act for Doe's benefit. The attorney formed a relationship of trust with Doe before presenting him with the conflicting retainer agreement that subverted that relationship of trust.

If a fiduciary relationship already exists, the fiduciary must disclose all material facts before diving through the escape hatch of a contractual disclaimer. Because of such a preexisting fiduciary relationship, the court in *Blue Chip Emerald LLC v. Allied Partners Inc.*, 750 N.Y.S. 2d 291 (N.Y. App. Div. 2002), declined to enforce a no-representation clause that was even more specific than the clause in *Danann*. In *Blue Chip*, 750 N.Y.S.2d at 293, the parties were joint venturers, and the venture's sole substantial asset was a commercial building in Manhattan. The plaintiffs decided to get out of the joint venture, and they sold their interest in the building to defendants for $80 million. *Id*. Two weeks later, the defendants sold the building to a third party, LVMH, for $200 million. *Id*. The plaintiffs then sued the defendants for breach of fiduciary duty and for fraud, seeking to recover the additional $60 million in profit they would have realized had they retained their one-half interest in the venture until the building was sold. *Id*. According to the

complaint, the defendants were guilty of the following misrepresentations and omissions, which had tricked the plaintiffs into selling their half-interest prematurely, at an unfairly low price: (1) the defendants had failed to disclose to the plaintiffs, and had misrepresented to them, the true price range in which the defendants were negotiating with LVMH for the sale of the building; (2) the defendants had failed to tell the plaintiffs, as of the date the plaintiffs sold their interest to them, that LVMH had already orally agreed to buy the building for $200 million; and (3) the defendants had falsely represented that the building needed renovations, so as to cause the plaintiffs to "seek a quick exit" from the venture. *Id.*

Perhaps it was no accident that the written buy-out agreement between the plaintiffs and defendants included a no-representation clause as to the projected proceeds from any future sale of the building. In the buy-out agreement, the plaintiffs acknowledged that, with one exception, the defendants had made no " 'representations or warranties' " as to " 'the actual or projected value of the Property for sale or leasing or to any other matter affecting or related to the Property.' " *Blue Chip*, 750 N.Y.S. 2d at 293-94. The sole exception was exhibit B of the buy-out agreement, in which the defendants listed the 16 third parties, including LVMH, with which the defendants had been discussing the possible " 'operation, leasing, sale and/or valuation of the Property.' " *Id.* at 294. The plaintiffs acknowledged that they had received an opportunity to conduct their own " 'due diligence' " with respect to the third parties listed in exhibit B and that the plaintiffs were satisfied with the information made available to them in conducting such due diligence. *Id.* The plaintiffs "expressly disclaimed *** 'any claim for fraud, breach of loyalty or fiduciary duty.'

- 41 -

" *Id.*

The lower court held that these contractual representations and disclaimers defeated the plaintiffs' complaint, but the Supreme Court of New York, Appellate Division, disagreed. *Blue Chip*, 750 N.Y.S.2d at 294. The lower court had overlooked the "key fact" that, as coventurers, the defendants were fiduciaries of the plaintiffs in all matters related to the venture and that this fiduciary relationship endured until the moment the buy-out transaction closed. *Id.* Until that moment, the defendants owed the plaintiffs " 'a duty of undivided and undiluted loyalty.' " *Id.* (quoting *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989)). Under this "stringent standard of conduct," whenever the fiduciary, in furtherance of its own interests, dealt with the beneficiary in a matter related to the fiduciary relationship, the fiduciary had to make full disclosure of all material facts-- meaning full disclosure of " 'any information that could reasonably bear on [the beneficiary's] consideration of [the fiduciary's] offer.' " Id. (quoting *Dubbs v. Stribling & Associates*, 752 N.E.2d 850, 852 (N.Y. 2001)). Absent such full disclosure, the transaction was voidable--including the contractual escape hatch. *Id.* at 294. If, as alleged in the complaint, the defendant co-venturers had kept to themselves, or misrepresented, material facts about their efforts to sell the property, "the contractual disclaimers the [lower] court invoked as grounds for dismissing [the] action would be voidable as the fruit of the fiduciary's breach of its obligation to make full disclosure." *Id.* at 294. In short, where parties in a preexisting fiduciary relationship make a contractual representation to one another that no representations have been made, the contract, including its no-representation clause, is voidable unless the fiduciary has made full disclosure of all

material facts. And, further, the contract will be voidable even if the beneficiary could have discovered those material facts on its own, through the use of due diligence.

"Facts are considered material if they would likely influence the principal's beliefs regarding the desirability of the transaction." *Letsos v. Century 21-New West Realty*, 285 Ill. App. 3d 1056, 1066, 675 N.E.2d 217, 225 (1996). Khan's belief in the desirability of the transactions likely would have been influenced by the fact that, contrary to defendants' representations to him, he stood no chance whatsoever of making any profit on the transactions but, on the contrary, he was certain to lose a large amount of money to Deutsche Bank. Another material fact was the existence of IRS Notice 1999-59, which, contrary to defendants' assurances, foreclosed Khan from claiming a loss for income-tax purposes if he lost money on the transactions. Defendants' failure to disclose these material facts to Khan (or, which comes to the same thing, to correct their previous misrepresentations to him) makes exhibit A of Wanser's affidavit voidable. And if exhibit A is voidable, so are the disclaimers within exhibit A. See *Blue Chip*, 750 N.Y.S.2d at 294; *Prueter v. Bork*, 105 Ill. App. 3d 1003, 1006, 435 N.E.2d 109, 112-13 (1981) ("Failure to read a document is normally no excuse for a party who signs it. Where however, as here, a fiduciary relationship exists and where the dominant party benefits from execution of the document by the subservient party, a presumption of invalidity arises. The burden was on defendants to show that plaintiff revoked [the trust, of which he was the beneficiary,] with full knowledge of the facts, including knowledge of the legal effect of his signature on the relevant documents.").

g. A Pre-Agency Fiduciary Duty

Thus far, we have discussed the possibility that before Khan signed any contract with Deutsche Bank, he and Deutsche Bank established a *fiduciary relationship as a matter of fact*: a relationship in which Khan reposed special trust in Deutsche Bank and Deutsche Bank accepted that trust, thereby gaining influence over him. See *Eldridge*, 246 Ill. App. 3d at 889, 617 N.E.2d at 62. We have explained that it is problematic, once a fiduciary relationship is established as a matter of fact, to present the principal with a proposed instrument denying the existence of the fiduciary relationship or denying reliance of the principal on the agent's representations and that such an instrument is voidable unless the agent has disclosed all material facts.

There is another type of fiduciary relationship besides a fiduciary relationship as a matter of fact, namely, a *fiduciary relationship as a matter of law*, and such a relationship exists between an agent and a principal. Consequently, one need not prove, factually, that an agent is a fiduciary toward the principal; the agent and principal are in a fiduciary relationship as a matter of law. *Carroll v. Caldwell*, 12 Ill. 2d 487, 495, 147 N.E.2d 69, 73 (1957); *Ransom v. A.B. Dick Co.*, 289 Ill. App. 3d 663, 672, 682 N.E.2d 314, 321 (1997); *Sokoloff v. Harriman Estates Development Corp.*, 754 N.E.2d 184, 188-89 (N.Y. 2001); Restatement (Third) of Agency §1.01 (2006).

A broker is, by definition, an agent: "an agent who negotiates contracts of purchase and sale (as of real estate, commodities, or securities)." Merriam-Webster's Collegiate Dictionary 145 (10th ed. 2000). See also *Owen Wagener & Co. v. U.S. Bank*, 297 Ill. App. 3d 1045, 1050, 697 N.E.2d 902, 906 (1998); *Barry Mogul & Associates, Inc. v. Terrestris Development Co.*, 267 Ill. App. 3d 742, 749, 643 N.E.2d 245, 251 (1994). A

"securities broker" is "[a] broker employed to buy or sell securities *for a customer*" (emphasis added) (Black's Law Dictionary 188 (7th ed. 1999)), and therefore the broker is the customer's agent (see Restatement (Third) of Agency §1.01 (2006)). Because the broker is the agent and the customer is the principal, they are in a fiduciary relationship as a matter of law.

Deutsche Bank, Brown, and Parse all admit that a broker-client relationship is what they offered to Khan. In their brief, Deutsche Bank and Brown state that plaintiffs paid them a total of $1,275,000 in 1999 and 2000 for "brokering" the option transactions. Likewise, in his motion for dismissal, Parse argued: "Plaintiffs fail to allege sufficient facts to show that Defendant Parse owed them a fiduciary duty beyond the ordinary broker-client relationship." Also, in his brief, Parse states: "As a broker and at Plaintiffs' request, Parse opened non-discretionary brokerage accounts for Plaintiffs at Deutsche Bank and executed trades in these accounts."

Nonetheless, the argument might be made that even though, by the Deutsche defendants' own admission, they agreed to be Khan's broker and, as such, became his agent and his fiduciary as a matter of law, this broker-client relationship (a type of agency) did not come into existence until Khan signed the contracts with Deutsche Bank and Brown. Until then, it might be argued, they were merely in pre-agency negotiations.

The supreme court has held, however, that if "the *creation* of the agency relationship involve[s] peculiar trust and confidence, with reliance by the principal on the fair dealing by the agent" (emphasis in original) (*Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 47, 643 N.E.2d 734, 741 (1994)), " 'the agent is under a duty to deal fairly with the

principal in arranging the terms of the employment' " (*Martin*, 163 Ill. 2d at 46, 642 N.E.2d 741 (quoting Restatement (Second) of Agency §390, cmt. e (1958))). In *Martin*, 163 Ill. 2d at 43, 643 N.E.2d at 739, the trial court found that a broker had failed to deal fairly with potential customers in arranging the terms of the broker's employment. Specifically, the broker had misled potential customers about the nature of the "foreign service fee" that the broker would charge in the sale of London Commodity Options. *Martin*, 163 Ill. 2d at 38, 643 N.E.2d at 737. Because investments in options, along with the associated fees and commissions, were extremely complicated matters, most investors needed the help of brokers to understand such matters. *Martin*, 163 Ill. 2d at 40, 643 N.E.2d at 738. Hence, the supreme court found that "the very creation of the agency relationship involve[d] a special trust and confidence on the part of the principal in the subsequent fair dealing of an agent" and that the broker owed a pre-agency fiduciary duty to honestly disclose the terms of the broker's employment as an agent. (Internal quotation marks omitted.) *Martin*, 163 Ill. 2d at 45, 643 N.E.2d at 740.

On appeal before the supreme court, the broker in *Martin* challenged this finding by the trial court, arguing that the plaintiffs had failed to prove, by clear and convincing evidence, that the broker was in a fiduciary relationship with potential customers *as a matter of fact* before the parties actually entered into a contract. *Martin*, 163 Ill. 2d at 45-46, 643 N.E.2d at 740-41. The supreme court explained, however, that establishing a fiduciary relationship *as a matter of fact* was unnecessary because the parties' relationship was already known: they were future broker-client and hence future agent-principal. *Martin*, 163 Ill. 2d at 47, 643 N.E.2d at 741. The relationship between a

broker and a client was fiduciary *as a matter of law* because it was an agency relationship. The "future principal and agent [were] discussing terms of the agency, specifically compensation, for a relationship that [would] be fiduciary as a matter of law." *Martin*, 163 Ill. 2d at 46, 643 N.E.2d at 741.

Therefore, the nature of the parties' relationship was not the real question in *Martin*. Instead, the question was "at what time that relationship attached concerning the agent's disclosures about his compensation." *Martin*, 163 Ill. 2d at 47, 643 N.E.2d at 741. The relationship attached during the pre-agency negotiations because, as the trial court found, the plaintiffs put special trust and confidence in the broker during those negotiations and relied on the broker to deal fairly with them (*Martin*, 163 Ill. 2d at 47-48, 643 N.E.2d at 741)--a finding which, the supreme court concluded, was not manifestly erroneous (*Martin*, 163 Ill. 2d at 47, 643 N.E.2d at 741).

Likewise, in this case, if we take the well-pleaded facts of the complaint to be true and regard them in a light most favorable to plaintiffs (see *Goldman*, 339 Ill. App. 3d at 182, 790 N.E.2d at 929), Khan reposed a special trust and confidence in the Deutsche defendants during the pre-agency negotiations. He had to rely on their expertise in the arcane realm of foreign-currency options. He trusted Parse to treat him fairly, and Parse did not treat him fairly. Parse allegedly misled him. Along with Shanbrom, Parse gave Khan the impression that he would be making an "investment" and that he would have a good chance of making a profit in the proposed transactions, whereas, in reality, the transactions would be designed to make Khan's loss of money to Deutsche Bank a foregone conclusion. In this sense, the deception concerned Deutsche Bank's compensation. Parse

failed to explain to Khan that Khan effectively would be paying Deutsche Bank $1,275,000 for choosing spot rates that would cause Deutsche Bank to win the wagers. Khan did not understand that he was paying Deutsche Bank large sums for the service of simply picking up the little ball, so to speak, and inserting it in the slot corresponding to Deutsche Bank's winning number. So, we conclude that plaintiffs have pleaded a cause of action against the Deutsche defendants for breach of fiduciary duty. We now will take up the question of whether plaintiffs have pleaded a cause of action for negligent misrepresentation.

3. *The Legal Sufficiency of Count III (Negligent Misrepresentation)*

As the Second Circuit said in *De Kwiatkowski*, 306 F.3d at 1308, "[a] broker may be liable in tort *** for breach of a duty owed in respect of advice given." Khan claims that he suffered pecuniary loss by relying on false information that defendants negligently or fraudulently gave him in the course of their business. Section 552(1) of the Restatement (Second) of Torts provides as follows:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."
> Restatement (Second) of Torts §552(1) (1977).

See also *Rozny v. Marnul*, 43 Ill. 2d 54, 66 (1969) (citing tentative draft of section 552);

*Kelley v. Carbone*, 361 Ill. App. 3d 477, 480 (2005) (citing section 552); *Cahill v. Eastern Benefit Systems, Inc.*, 236 Ill. App. 3d 517, 521 (1992) (same).

Given the well-pleaded facts of the complaint, which we accept as true and which we construe in a light most favorable to plaintiffs, the Deutsche defendants were acting in the course of their employment when giving Khan advice about the "investments" and tax consequences. They gave Khan this advice for his guidance in his business transactions. The advice, however, was false in that the "investments" were not investments and the tax losses would not be allowable, and defendants were aware, or should have been aware, of the falsity. Plaintiffs suffered resulting pecuniary losses in the form of contractual fees, attorney fees, back taxes, interest, and penalties.

### 4. *Dismissal on the Basis of Statutes of Limitations*

#### a. Our Standard of Review

Thus far in our analysis, we have concluded that counts I and III of the complaint are legally sufficient: plaintiffs have pleaded causes of action against the Deutsche defendants for breach of fiduciary duty and negligent misrepresentation. Now we will consider whether those actions are time-barred.

Pursuant to section 2-619 (735 ILCS 5/2-619 (West 2008)), the trial court granted defendants' motion to dismiss plaintiffs' claims on the ground that various statutes of limitations barred the claims. Before beginning our review of that ruling, we will discuss our standard of review. We review *de novo* a trial court's ruling on a motion for dismissal pursuant to section 2-619, that is, we give no deference to the trial court. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59, 857 N.E.2d 229, 236 (2006). In performing this *de novo*

review, we accept as true all well-pleaded facts in the complaint, and from those facts, we draw inferences in the plaintiff's favor whenever it would be reasonably defensible to do so. *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343, 352, 882 N.E.2d 583, 588 (2008). We interpret not only the complaint but all pleadings and supporting documents in a light most favorable to the plaintiff. *Id.*

We also give the plaintiff the benefit of the doubt if there is a question of fact as to when the plaintiff had the knowledge, or reasonably should have had the knowledge, that causes the statutory period of limitation to start running. See *Knox College v. Celotex Corp.*, 88 Ill. 2d 407, 414-15, 430 N.E.2d 976, 979-80 (1981) (discussing the "discovery rule"). Typically, it is for the trier of fact to decide when the plaintiff knew or reasonably should have known of the injury and when the plaintiff knew or reasonably should have known that the injury was wrongfully caused. *Nolan v. Johns-Manville Asbestos*, 85 Ill. 2d 161, 171, 421 N.E.2d 864, 868-69 (1981); *Gale v. Williams*, 299 Ill. App. 3d 381, 386, 701 N.E.2d 808, 811 (1998). A court may decide this question as a matter of law, however, if the facts are undisputed and only one conclusion could be reasonably drawn from those facts. *Nolan*, 85 Ill. 2d at 171, 421 N.E.2d at 868-69; *Gale*, 299 Ill. App. 3d at 386, 701 N.E.2d at 811.

b. The Trial Court's Application of the Discovery Rule

A literal interpretation of a statute of limitations could start the clock ticking just as soon as the injured party becomes aware of the injury. Such an interpretation could lead to harsh results because an injured party, even a reasonably attentive injured party, might learn of the injury much sooner than he or she learns it was wrongfully caused.

*Witherell v. Weimer*, 85 Ill. 2d 146, 155, 421 N.E.2d 869, 874 (1981). An action could become time-barred before the injured party has any reason to suspect that he or she has a cause of action. To avoid such a harsh outcome, the supreme court has adopted the "discovery rule," whereby the statutory period starts running "when a person knows or reasonably should know of his injury *and also* knows or reasonably should know that it was wrongfully caused." (Emphasis added.) *Knox College*, 88 Ill. 2d at 415, 430 N.E.2d at 980.

In its remarks from the bench on December 3, 2009, the trial court concluded that plaintiffs sustained their first injury in 1999 or 2000, when they paid the contractual fees to the co-conspirators, and that their cause of action therefore accrued in 1999 or in 2000 at the latest. See *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 364, 657 N.E.2d 894, 900 (1995) ("the limitations period commences when the plaintiff is injured, rather than when the plaintiff realizes the consequences of the injury or the full extent of her injuries"); Black's Law Dictionary 21 (7th ed. 1999) (defining "accrue" as "[t]o come into existence as an enforceable claim or right").

Owing to the discovery rule, however, the period of limitation does not necessarily start running on the date that a cause of action accrues. The trial court considered the extent to which the discovery rule postponed the starting of the limitation period (see *Knox College*, 88 Ill. 2d at 414, 430 N.E.2d at 979), that is, how long it was before plaintiffs knew or reasonably should have known that the injury, *i.e.*, their payment of the contractual fees, was wrongfully caused (see *Knox College*, 88 Ill. 2d at 415, 430 N.E.2d at 980). The court found that when plaintiffs hired a tax attorney in May 2003 to represent them in the IRS audit, plaintiffs reasonably should have discovered that their

injury had been wrongfully caused, because their attorney, in the exercise of due diligence, should have discovered IRS Notices 1999-59 and 2000-44, which, according to the complaint, clearly indicated that the losses generated by the investment strategies were bogus and invalid.

Beginning in May 2003, when plaintiffs, through their tax attorney, should have discovered the dispositive IRS notices, plaintiffs had five years at the longest to file their lawsuit, so the trial court held. The longest applicable statute of limitations was 5 years (735 ILCS 5/13-205 (West 2008)) rather than 10 years (735 ILCS 5/13-206 (West 2008)) because the court regarded plaintiffs' contractual claims as disguised tort claims. See *Armstrong*, 174 Ill. 2d at 294, 673 N.E.2d at 296. Since plaintiffs filed their complaint in July 2009, more than five years after May 2003, the court concluded that the claims in the complaint were time-barred.

### c. Actual Harm, or the Present Existence of Damages

#### i. *Federated and Feddersen*

As we have explained, the discovery rule prevents a statutory period of limitation from running until both of the following conditions are fulfilled: (1) the party knows, or reasonably should know, that the party has been injured; and (2) the party knows, or reasonably should know, that the injury was wrongfully caused. *Knox College*, 88 Ill. 2d at 415, 430 N.E.2d at 980. Hence, the first condition requires the infliction of an actual injury; it requires damages. Obviously, a party cannot become subjectively aware of damages unless the damages objectively exist, that is, unless the party has in fact incurred a loss for which the party presently could seek compensation in court (assuming

that the loss were wrongfully caused).

Plaintiffs insist that they incurred no damages until 2008, when the IRS disallowed the "losses" generated by the 1999 Digital Options Strategy and the 2000 COINS Strategy. They contend that the trial court erred in its conclusion that they suffered damages as early as 1999 or 2000, when they paid the contractual fees to the co-conspirators. They regard that conclusion as inconsistent with case law, including *Federated Industries, Inc. v. Reisin*, 402 Ill. App. 3d 23, 927 N.E.2d 1253 (2010), which was issued after the trial court's decision.

In *Federated*, 402 Ill. App. 3d at 24, 927 N.E.2d at 1255, the plaintiffs were a holding company, Federated Industries, Inc., as well as the direct and beneficial owners of Federated's stock. The defendants were an accounting firm and its director. *Federated*, 402 Ill. App. 3d at 24, 927 N.E.2d at 1255. Federated had hired the defendants to be its accountants, and in that capacity, the defendants had the responsibility of helping Federated maintain its status as an S-corporation for federal income-tax purposes. *Id.* That meant keeping track of Federated's passive investment income. If, for three consecutive years, Federated's passive investment income exceeded 25% of its gross receipts, Federated could lose its status as an S-corporation and consequently incur greater taxation. To keep that from happening, the defendants were supposed to monitor Federated's passive investment income for each year, and if the passive investment income was likely to exceed 25% of gross receipts for the taxable year, the defendants were supposed to advise Federated to shift some of its resources into investments yielding nonpassive investment income, so that Federated could retain its status as an S-

corporation. *Id.*

In late 2004 and early 2005, the IRS audited Federated, and in September 2005, the IRS issued a notice of proposed adjustment, in which the IRS concluded that Federated had passive investment income in excess of 25% of its gross receipts in the taxable years 2000, 2001, and 2002, and that consequently Federated's S-corporation status should be terminated. *Federated*, 402 Ill. App. 3d at 25, 927 N.E.2d at 1256.

In October 2005, Federated, the defendants, and the IRS attended a settlement meeting, at which the IRS presented a proposal for closing the Federated audit and avoiding the involuntary termination of Federated's S-corporation status. *Federated*, 402 Ill. App. 3d at 26, 927 N.E.2d at 1256. The proposal entailed "adjustments" for the calendar years 2002 and 2003. *Id.* In a letter to the IRS dated December 27, 2005, the plaintiffs agreed to the IRS's settlement proposal, which, in return for the retention of Federated's S-corporation status, would entail the payment of an additional tax, the specific amount of which was yet to be determined. *Federated*, 402 Ill. App. 3d at 36, 927 N.E.2d at 1264.

In April 2006, the IRS sent Federated an acceptance form for the plaintiffs to sign. This acceptance form specified the amount of additional income tax for 2002 and 2003 that Federated would have to pay to retain its S-corporation status. *Federated*, 402 Ill. App. 3d at 26, 927 N.E.2d at 1257. On May 17, 2006, Federated returned the signed form to the IRS along with a check. *Id.*

On May 15, 2008, the plaintiffs brought an action against the defendants for accounting malpractice, alleging that the defendants had negligently miscalculated

Federated's passive investment income for the years 2002, 2003, and 2004, causing the plaintiffs to incur liability to the IRS in the total amount of $14 million in additional taxes, interest, and penalties. *Federated*, 402 Ill. App. 3d at 26-27, 927 N.E.2d at 1257. The trial court granted the defendants' motion for dismissal on the ground that the plaintiffs had failed to file their lawsuit within the two-year period for accounting malpractice actions, as provided in section 13-214.2(a) of the Code (735 ILCS 5/13-214.2(a) (West 2008)). *Federated*, 402 Ill. App. 3d at 27, 927 N.E.2d at 1257.

On appeal to the First District, the plaintiffs argued that, contrary to the trial court, the two-year period of limitation had not begun running until May 17, 2006, when plaintiffs signed the formal written acceptance of the IRS's proposed adjustments. *Federated*, 402 Ill. App. 3d at 27, 927 N.E.2d at 1257. The defendants argued, on the other hand, that the limitation period began to run in December 2005, when the plaintiffs unanimously consented to the IRS's proposed adjustments, because at that time, the plaintiffs consented to incurring additional liability to the IRS (in some as of yet unspecified amount) and hence they knew they had sustained damages as of that time. *Federated*, 402 Ill. App. 3d at 29, 927 N.E.2d at 1258.

The case required the First District to decide "when taxpayers, whose tax returns have been challenged by the IRS, know or have reason to know that they have a cause of action against their accountants." *Federated*, 402 Ill. App. 3d at 28, 927 N.E.2d at 1258. In other words, when, according to the discovery rule, did the two-year period of limitation begin running with respect to an action against the accountant? The First District held that for purposes of an accounting malpractice case involving increased tax

liability, the period of limitation began running at the earliest of two dates: when the taxpayer received the notice of deficiency pursuant to section 6212 of the Internal Revenue Code (26 U.S.C. §6212 (2006)) or when the taxpayer agreed with the IRS's proposed deficiency assessments. *Federated*, 402 Ill. App. 3d at 36, 927 N.E.2d at 1264-65. Under that approach, the two-year period began running on December 27, 2005, when the plaintiffs signified their unanimous consent to paying additional taxes to be determined by the IRS. Hence, the First District concluded that the lawsuit, which the plaintiffs filed on May 15, 2008, was time-barred. *Federated*, 402 Ill. App. 3d at 36-37, 927 N.E.2d at 1265.

In reaching that conclusion, the First District intended to follow the decision of the Supreme Court of California in *International Engine Parts, Inc. v. Feddersen & Co.*, 888 P.2d 1279 (Cal. 1995), but, actually, the holdings in *Federated* and *Feddersen* are slightly different. Whereas *Federated* held that the period of limitation began running when the IRS issued a notice of deficiency (or when the taxpayer agreed with the IRS's proposed tax adjustment) (*Federated*, 402 Ill. App. 3d at 36, 927 N.E.2d at 1264-65), *Feddersen* held that the period began running when the IRS made an assessment (*Feddersen*, 888 P.2d at 1287). An assessment is the final step in the assessment process, and it comes after a notice of deficiency.

The notice of deficiency informs the taxpayer that the IRS has determined a deficiency in the amount of tax that a taxpayer has paid. 26 U.S.C. §6212(a). (The notice of deficiency is not to be confused with a notice of audit. A notice of deficiency comes after the audit, if the audit reveals that the taxpayer has underpaid.) According to the statute, the notice of deficiency "describe[s] the basis for, and identif[ies] the amounts (if any) of,

the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." 26 U.S.C. §7522(a) (2006). The notice of deficiency also is called a "90-day letter" because the taxpayer has 90 days after receipt of the notice in which to file a petition with the Tax Court if the taxpayer wishes the Tax Court to "redetermine" the deficiency. 26 U.S.C. §6213(a) (2006); 35 Am. Jur. 2d *Federal Tax Enforcement* §175 (2001).

If 90 days elapse without the taxpayer's filing a petition for redetermination in tax court, the IRS may assess the deficiency. 26 U.S.C. §6202 (2006); 26 C.F.R. §301.6213-1(a) (2009). If, however, the taxpayer files a timely petition for redetermination in tax court, the IRS may assess the deficiency only when the decision of the tax court becomes final and nonappealable (assuming, of course, that the decision is favorable to the IRS). *Id.*

The IRS makes an assessment by recording the liability of the taxpayer in the office of the Secretary of the Treasury. 26 U.S.C. §6203 (2006); 26 C.F.R. §301.6203-1 (2009). The assessment creates a lien on the taxpayer's property. 26 U.S.C. §6322 (2006). Thus, " 'in the federal scheme[,] assessment involves the taking of an interest in the taxpayer's property after affording the taxpayer notice of an alleged deficiency and an opportunity to challenge the deficiency.' " *In re Lewis*, 199 F.3d 249, 252 (5th Cir. 2000) (quoting *In re King*, 961 F.2d 1423, 1425 (9th Cir. 1992)). In other words, the notice of deficiency gives the taxpayer an opportunity to judicially challenge the IRS's determination of tax liability, and the assessment is the concluding event in the assessment proceeding.

For three reasons, *Feddersen* deemed the assessment as the commencement

of actual injury in cases in which a taxpayer sued an accountant for negligently causing the taxpayer to incur additional liability to the IRS. First, treating the assessment as the beginning of the limitation period would conserve judicial resources. *Feddersen*, 888 P.2d at 1287. If the taxpayer sued the accountant before the assessment, something could happen that would make the lawsuit against the accountant a waste of time and highlight its purpose as nothing more than a hedging of bets. For example, the taxpayer and the IRS could reach a settlement favorable to the taxpayer in an appeals office conference (see 26 C.F.R. §601.103(c)(1) (2009)), or the tax court could enter judgment in favor of the taxpayer, or the IRS could miss the three-year deadline for making an assessment (see 26 U.S.C. §6501(a) (2006)). Then the lawsuit against the accountant would turn out to be a waste of resources because it would have to be dismissed due to a lack of damages. See 26 U.S.C. §6215(a) (2006). Or, worse yet, if the taxpayer first wins a judgment against the accountant and subsequently the IRS never assesses the taxpayer with a deficiency, the damages the taxpayer won from the accountant would be an unjust windfall, putting our judicial system in disrepute. Such an injustice can be avoided by keeping in mind that the taxpayer has not been actually injured until the taxpayer has been assessed. Until then, the determination of tax liability is merely tentative or provisional. The IRS does not send a demand for payment until after it makes the assessment. 26 U.S.C. §6303(a) (2006); 26 C.F.R. §§301.6213-1(c), 301.6303-1(a) (2009).

Second, requiring the taxpayer to sue the accountant while assessment proceedings still are pending would put the taxpayer in the untenable position of making allegations in the negligence action that could be used against the taxpayer in the

assessment proceedings or in tax court. *Feddersen*, 888 P. 2d at 1287. For example, the complaint in the negligence action no doubt would be admissible in tax court as the admission of a party-opponent.

Third, during the audit, the taxpayer might need the accountant's continuing services. The taxpayer might need the accountant's help in responding to the audit. *Feddersen*, 888 P.2d at 1287. If the taxpayer had to sue the accountant at the outset, their collaborative relationship would come to an end. See also *Federated*, 402 Ill. App. 3d at 36, 927 N.E.2d at 1264.

We find these three points in *Feddersen* to be persuasive. See also *CDT, Inc. v. Addison, Roberts & Ludwig, C.P.A., P.C.*, 7 P.3d 979, 985 (Ariz. Ct. App. 2000); *Sladky v. Lomax*, 538 N.E.2d 1089, 1091 (Ohio Ct. App. 1988); *Streib v. Veigel*, 706 P.2d 63, 67 (Idaho 1985); *Snipes v. Jackson*, 316 S.E.2d 657, 659 (N.C. Ct. App. 1984); *Chisolm v. Scott*, 526 P.2d 1300, 1301-02 (N.M. Ct. App. 1974); *Atkins v. Crosland*, 417 S.W.2d 150, 153 (Tex. 1967). We agree with *Feddersen* that for purposes of a malpractice action against an accountant for negligently causing the plaintiff-taxpayer to incur additional liability to the IRS, the taxpayer does not incur actual harm until the IRS makes an assessment by recording the liability of the taxpayer in the office of the Secretary of the Treasury. See 26 U.S.C. §6203 (2006). There is an exception: if, during the assessment proceedings (that is, before the making of an assessment), the taxpayer enters into a settlement with the IRS whereby the taxpayer binds itself to pay a deficiency--regardless of whether the IRS has as of yet determined the specific amount of the deficiency--the actual harm occurs at the time of the settlement. See *Federated*, 402 Ill. App. 3d at 36, 927 N.E.2d at 1264. In other

words, if the taxpayer "agree[s] to additional tax liability," "[t]he fact that the amount of [the additional] tax liability [is] not immediately ascertainable [would] not postpone the triggering of the statute of limitations." *Id*. Thus, we agree with the holding of the First District in *Federated*--with a slight modification, substituting the assessment for the notice of deficiency. In summary, then: For purposes of an accounting malpractice case involving increased tax liability, the taxpayer suffers actual harm upon the earliest of two events: (1) assessment or (2) the taxpayer's agreement with the IRS to pay additional taxes, penalties, or interest that the taxpayer would not have had to pay but for the accountant's substandard performance. This is the principle that we glean from a synthesis of *Federated* and *Feddersen.*

Deutsche Bank and Brown argue, however, that *Federated* and *Feddersen* are inapposite because unlike the defendants in those cases, Deutsche Bank and Brown are not accountants. Deutsche Bank and Brown insist that "[t]ax advice, even if given negligently, cannot give rise to a malpractice claim unless given by a *professional tax adviser*." (Emphasis in original.) They maintain that "[s]uch representations, however negligent or wrongful, cannot amount to a malpractice claim unless made by a professional *in that field*." (Emphasis in original.)

We see no reason to become fixated on the label "malpractice claim." Regardless of whether one calls it "malpractice" or something else, the Deutsche defendants, like an accountant, gave tax advice to Khan. One does not have to be an accountant to incur liability for giving negligent tax advice. Rather, all section 552(1) of the Restatement (Second) of Torts requires is the following: (1) the Deutsche defendants gave

- 60 -

the tax advice in the course of their business or in a transaction in which they had a pecuniary interest, (2) they gave the tax advice for Khan's guidance in his business transactions, (3) the tax advice was false, (4) the Deutsche defendants failed to exercise reasonable care or competence in obtaining the tax information or in communicating it to Khan, (5) Khan justifiably relied on the tax advice, and (6) he suffered pecuniary loss as a consequence. See Restatement (Second) of Torts §552(1) (1977). If those six conditions were fulfilled, the Deutsche defendants would be liable to Khan for the negligent tax advice regardless of whether they were entitled, by licensing or certification, to claim the title of "professional tax adviser" or "accountant."

Given that, like an accountant, the Deutsche defendants can incur liability in tort for giving negligent tax advice in the course of their business, we ask the same question that we would ask if the advice had come from an accountant: Have plaintiffs suffered any actual harm (damages) from the advice and if so, when did they suffer the actual harm? *Federated* and *Feddersen* speak to that question.

The Deutsche defendants try to consign *Federated* and *Feddersen* to irrelevance on the ground that unlike accountants, the Deutsche defendants are not expected to assist the former client during an IRS audit. It is true that part of the rationale in *Federated* and *Feddersen* was that the taxpayer might need the accountant's continuing services during the audit. *Federated*, 402 Ill. App. 3d at 36, 927 N.E.2d at 1264; *Feddersen*, 888 P.2d at 1287. That part of the rationale, however, seems secondary. The main point of *Feddersen* is that until the assessment, the taxpayer's harm is potential, not actual (*Feddersen*, 888 P.2d at 1287): harm is contingent on future action by the IRS, and a

lawsuit cannot be premised on contingent harm (see *Siemieniec v. Lutheran General Hospital*, 117 Ill. 2d 230, 259, 512 N.E.2d 691, 706 (1987)). The plaintiff cannot seek compensation for a blow that has not yet fallen, even though the arm be upraised.

So, we conclude that the trial court erred in dismissing the actions against the Deutsche defendants as time-barred. Indeed, we hold, as a matter of law, that the actions against those defendants are not time-barred, given the allegations of the complaint. We find no indication in the complaint that more than five years (or even two years) have elapsed since an assessment or a settlement with the IRS. Until an assessment or settlement, there was no actual harm and hence no accrual of a cause of action--even if, by May 2003, it had become abundantly clear to Khan that defendants had given him false advice. Negligence without harm does not make a cause of action.

### 5. *Ripeness*

Because we construe the allegations of the complaint in a light most favorable to plaintiffs (see *Porter*, 227 Ill. 2d at 352, 882 N.E.2d at 588), we construe the complaint as alleging that the IRS assessed them with a deficiency. Paragraph 208 of the complaint alleges as follows:

> "In 2003 and 2004, Plaintiffs received Notices of Audit
> (Notice of Beginning of Administrative Proceeding and/or
> notice that their tax return was selected for examination) for
> the 1999-2001 tax returns. In 2008, Plaintiffs received certain
> Notice of Adjustment from the IRS indicating that the IRS
> intended to disallow the Investment Strategies. Also in 2008,

Plaintiffs received several Notices of Deficiency with respect to the IRS's disallowance of the Investment Strategies. The IRS determined in 2008 that Plaintiffs owed substantial back-taxes, penalties and interest as a direct result of the Investment Strategies."

Because the complaint does not allege that plaintiffs filed a petition for redetermination in the Tax Court within 90 days, we assume the IRS had assessed them for the deficiencies by the time they filed their complaint in July 2009 and that in the final sentence of the foregoing quotation, plaintiffs allege, in so many words, that the IRS assessed them in 2008.

If, however, there has not been an assessment as of yet or if plaintiffs have not settled with the IRS, defendants, on remand, may move for the dismissal of the action, without prejudice, on the ground that the case is not ripe. See 735 ILCS 5/2-619(a)(9) (West 2008); *Schulte v. Burch*, 151 Ill. App. 3d 332, 336, 502 N.E.2d 856, 859 (1986); *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 358, 703 N.E.2d 473, 480 (1998). On the face of the complaint, the unripeness is not sufficiently clear for us to affirm the dismissal on that ground.

B. Case No. 4-10-0583 (Grant Thornton)

1. *Apple Valley and Van Dyke*

What we have said about actual harm and ripeness applies with equal force to Grant Thornton. In fact, *Federated* and *Feddersen*, with their discussion of actual harm, are an even better fit for Grant Thornton because Grant Thornton is an accounting firm.

Grant Thornton, on the other hand, cites and elucidates some cases in which California courts declined to apply *Feddersen* to an action against an accountant, namely, *Apple Valley Unified School District v. Vavrinek, Trine, Day & Co.*, 120 Cal. Rptr. 2d 629 (Cal. Ct. App. 2002), and a case on which *Apple Valley* relied, *Van Dyke v. Dunker & Aced*, 53 Cal. Rptr. 2d 862 (Cal. Ct. App. 1996). Unlike *Feddersen*, however, *Apple Valley* and *Van Dyke* did not involve the negligent preparation of a tax return and ensuing IRS assessment proceedings. The facts in those cases are not analogous to those in *Feddersen*.

In *Apple Valley*, for example, the client, a school district, sued an accountant and her employing accounting firm, "claiming defendants' misrepresentations in an audit report induced the District to provide state funds to a charter school which was not entitled to the funds." *Apple Valley*, 120 Cal. Rptr. 2d at 631. The defendants issued their defective audit report in January 1998. *Id.* at 632. In April 1998, a former employee of the charter school provided the school district with documentation of wrongdoing by the charter school, wrongdoing that made the charter school ineligible for the funds. *Id.* at 633. The school district hired a different accountant as well as legal counsel, and in November 1998, it revoked the school's charter. *Id.* In 2000, the state comptroller completed an audit and concluded that the charter school had received $4.4 million in funds to which it was not entitled. *Id.* at 633. The district appealed the controller's audit, and the appeal was still pending when the school district sued the defendant accountants. *Id.*

The defendants moved to dismiss the lawsuit as time-barred, and the trial court granted their motion. On appeal, the school district argued, on the authority of *Feddersen*, that it had not suffered actual injury until January 2000, when the controller's

audit report concluded that the school district was liable to the state for overpayments to the charter school. *Apple Valley*, 120 Cal. Rptr. 2d at 636. The Court of Appeal of California disagreed, holding that a two-year statute of limitation barred the action. The court held that the school district sustained actual injury "no later than early 1998, when the District recognized the allegedly improper conduct and incurred out-of-pocket expenses to determine its extent." *Id.* at 641.

In the present case, by contrast, plaintiffs expended no fees to investigate their own perceived liability. The school district's payment of fees to the second accountant and to legal counsel in *Apple Valley* is not truly comparable to plaintiffs' payment of fees to their attorney in the IRS audit, because the school district's investigation is different from an IRS audit. Unlike plaintiffs in this case, the school district did not pay the fees to defend itself against the allegations of wrongdoing leveled against it by a third party (the IRS)--allegations that might or might not lead to liability. Rather, the school district paid the fees in the conduct of its own investigation, an investigation prompted by the school district's own realization that because of the defendants' misrepresentations, the school district had disbursed state funds to an unqualified recipient, thereby rendering the school district liable to the state. In that respect, *Apple Valley* is distinguishable.

*Van Dyke* likewise is distinguishable because the types of actual harm that the plaintiffs sustained in that case have no counterpart in the present case. On the basis of allegedly negligent advice by the defendant accountant, the plaintiffs in *Van Dyke* made a charitable contribution of some land. *Van Dyke*, 53 Cal. Rptr. 2d at 864. Relying on *Feddersen*, the plaintiffs argued that "their cause of action did not accrue until December

1994 when the IRS finally determined the impact of the charitable property donation on their 1990 tax obligation." *Id.* at 866. The Court of Appeal of California disagreed. The court explained that "the *Feddersen* rule [was] expressly limited to a specific type of accountant malpractice, i.e., 'the negligent preparation of tax returns.'" *Id.* at 868 (quoting *Feddersen*, 888 P.2d at 1288). Unlike the taxpayer in *Feddersen*, the plaintiffs in *Van Dyke* suffered an actual injury before the IRS's final determination of their tax liability in an audit of the tax return. "[The] appellants suffered actual injury either in 1990 when they unconditionally conveyed their property to the Oakdale Fire District, or in 1991 when they paid taxes in excess of the amount they expected to pay after donating their property pursuant to the erroneous tax advice." *Id.* at 868. The present case appears to contain no comparable actual injury predating the IRS assessment.

So, just because California courts have declined to apply *Feddersen* to *all* actions against accountants, it does not logically follow that *Feddersen* is inapplicable to the present case. We echo the Court of Appeal of California:

"Here, we consider the application of *Feddersen* to accounting malpractice that *is* based upon a claim that the client incurred damages as a result of the negligent preparation of tax returns. The fact that *Feddersen* 'did not articulate a "rule for all seasons" ' [citation]--or that it did not even prescribe a rule applicable to all accounting malpractice actions--is not germane. Our application of *Feddersen* here *** is easily reconcilable with *Apple Valley*'s refusal to apply

- 66 -

*Feddersen*'s bright-line rule where the accountants' allegedly deficient performance did not concern tax return preparation." (Emphasis in original.) *Sahadi v. Scheaffer*, 66 Cal. Rptr. 3d 517, 540 (Cal. Ct. App. 2007).

2. *Contractual Fees as a Contingent Harm Rather Than an Actual Harm*

Grant Thornton believes that in the present case, it can identify an actual harm inflicted earlier than an assessment, namely, the fees that Khan paid Grant Thornton to prepare the 2000 tax return for Thermosphere. Grant Thornton points out that unlike the plaintiffs in *Federated*, plaintiffs in this case seek to recover the fees they have paid to defendants. Grant Thornton argues that *Federated* is distinguishable because in *Federated*, the plaintiffs did not seek to recover the fees they had paid to the defendant accountants whereas, in the present case, plaintiffs allege that defendants "defrauded [them] at the outset" and that plaintiffs were damaged at the outset by the fees they paid to the defendants: "the fees paid [are] an element of damage."

By Grant Thornton's reasoning, though, *Federated* would apply only to cases in which the accountant prepared the tax return *gratis*. In every case in which the client paid the accountant for preparing the tax return, the client would incur actual harm at the outset instead of later, at the assessment. Since accountants generally expect to be paid for their work, *Federated* effectively would be reduced to nothing. It seems highly improbable, then, that the First District intended the applicability of *Federated* to turn on whether the accountant charged a fee for his or her services.

Nor can the applicability of *Federated* turn on whether the plaintiff chooses

to claim the fees as an element of damages. *Federated* presupposes the discovery rule, and the discovery rule is indifferent to whether the plaintiff seeks compensation for the earliest harm. A plaintiff cannot evade the statute of limitations by being selective about the harms the plaintiff alleges in the lawsuit, including the later harms but excluding the earlier ones.

The payment of fees cannot even be characterized as an "earlier harm" until the IRS *assesses* a deficiency (or the client settles with the IRS). The payment of fees to defendants became actual damages, or will become actual damages, only upon the filing of the assessment in the office of the Secretary of the Treasury. Only then will the fees turn out to be devoid of their intended benefit. In return for the payment of fees to defendants, plaintiffs were to receive either of the following benefits: the making of a profit in the digital option transactions or, alternatively, a capital loss that would reduce their taxable income. Until the IRS disallows the loss and, consequently, assesses the deficiency along with interest and penalties, the fees that plaintiffs paid to defendants are not yet a waste, because plaintiffs have not yet been deprived of the contemplated benefit of their bargain, namely, the alternative benefit of a tax loss.

### 3. *The Attorney Fees the Khans Incurred in the IRS Audit: Merely a Potential Harm Until the Assessment*

It might be argued that plaintiffs incurred actual harm in 2003 by having to pay an attorney to represent them in the IRS audit. That argument, however, would go against the grain of case law. By the logic of *Lucey*, 301 Ill. App. 3d 349, 703 N.E.2d 473, the attorney fees would not qualify as actual harm until the IRS assesses a deficiency.

In *Lucey*, 301 Ill. App. 3d at 351, 703 N.E.2d at 475, the plaintiff was employed by The Chicago Corporation, which was in the business of providing advice and

brokerage services. Michigan Physicians Mutual Liability Company (Michigan Physicians) was one of the clients of The Chicago Corporation, and the plaintiff was assigned to this client's account. *Id.* In the course of his employment at The Chicago Corporation, the plaintiff sometimes attended investment committee meetings of Michigan Physicians and advised the investment committee on the company's portfolio. *Id.* Michigan Physicians requested the plaintiff to attend the investment committee meeting scheduled to be held in July 1989. *Id.*

Around this time, the plaintiff was thinking about resigning from The Chicago Corporation and starting his own firm. *Lucey*, 301 Ill. App. 3d at 351, 703 N.E.2d at 475. He sought legal advice from Theodore Gertz and the law firm of Pretzel & Stouffer as to the propriety of soliciting clients before his resignation. *Id.* In July 1989, Gertz advised the plaintiff that if he attended the investment committee meeting in his own capacity and informed The Chicago Corporation ahead of time that he would be resigning and that he would be attending the meeting in his own capacity, and if he paid his own expenses to attend the meeting, he could go to the meeting and inform Michigan Physicians of his decision to resign from The Chicago Corporation and to start his own firm. *Id.* The plaintiff followed that advice. Michigan Physicians informed The Chicago Corporation that it would be transferring its portfolio to the plaintiff's new firm. The Chicago Corporation then sued the plaintiff for the loss of the Michigan Physicians account (the *Chicago Corporation* lawsuit). *Lucey*, 301 Ill. App. 3d at 351-52, 703 N.E.2d at 475-76.

In July 1995, while the *Chicago Corporation* case was still pending, the plaintiff brought an action against Gertz and Pretzel & Stouffer for legal malpractice. *Lucey*,

301 Ill. App. 3d at 352, 703 N.E.2d at 476. The trial court granted the defendants' motion to dismiss the complaint on the ground that more than five years had elapsed since the defendants allegedly gave the negligent advice in July 1989 and therefore the statute of limitations applicable to legal malpractice actions (735 ILCS 5/13-205 (West 1992)) barred the action. *Id.* The court reasoned that the only harm alleged by the plaintiff was the filing of the *Chicago Corporation* suit in August 1989 and hence the five-year statute of limitations expired in August 1994. *Id.*

The appellate court agreed that the action should be dismissed--but not because of the statute of limitations. Rather, the appellate court held that the malpractice action was premature prior to the entry of an adverse judgment against the plaintiff in the *Chicago Corporation* case. *Lucey*, 301 Ill. App. 3d at 353, 356, 703 N.E.2d at 476, 479. Until then, the plaintiff faced the mere possibility of harm. *Lucey*, 301 Ill. App. 3d at 353, 703 N.E.2d at 477. It is true that the plaintiff had to pay attorney fees to defend himself in the *Chicago Corporation* suit. Nevertheless, until the *Chicago Corporation* case ended in an unfavorable result for the plaintiff, it had not yet been established that the attorney fees were a harm caused by the allegedly negligent advice of Gertz and Pretzel & Stouffer. The appellate court explained:

> "[W]here an attorney's neglect is *not* a direct cause of the legal
> expenses incurred by the plaintiff (*i.e.*, the plaintiff prevails
> when sued or loses for reasons other than incorrect legal
> advice), the attorney fees incurred are generally not actionable.
> Since it is also possible the former client will prevail when sued

by a third party, damages are entirely speculative until a judgment is entered against the former client or he is forced to settle." (Emphasis in original.) *Lucey*, 301 Ill. App. 3d at 355, 703 N.E.2d at 478.

Thus, if a third party sues the plaintiff, supposedly because the plaintiff followed the defendant's defective legal advice, the attorney fees that the plaintiff incurs as a result of such suit will not qualify as damages for purposes of an action against the defendant until the third party prevails against the plaintiff. And even then, it must be shown that the cause of the plaintiff's liability to the third party was the plaintiff's following the defendant's advice.

These principles should hold true even though the purportedly negligent advice came from a non-attorney who is subject to liability under section 552(1) of the Restatement (Second) of Torts. The attorney fees that plaintiffs incurred in the IRS audit are damages only upon the filing of an assessment by the IRS or only when plaintiffs are forced to settle with the IRS, whichever event comes earliest.

### 4. *The Statute of Repose*

#### a. The Lengthening, Rather Than Condensing, Effect of the Qualification in Section 13-214.2(b)

The trial court held that the statute of repose in section 13-214.2(b) of the Code (735 ILCS 5/13-214.2(b) (West 2008)) barred any action by plaintiffs against Grant Thornton for accounting malpractice. (It is unclear how *all* the business-entity plaintiffs could have a cause of action against Grant Thornton, considering that Grant Thornton only prepared the 2000 tax return for Thermosphere along with the K-1 forms that the Khans

- 71 -

used in their individual returns. Perhaps, as the litigation progresses, this point will be clarified.) Subsection (b) consists of a deadline followed by a qualification of the deadline:

"In no event shall such action be brought more than 5 years after the date on which occurred the act or omission alleged in such action to have been the cause of the injury to the person bringing such action against a public accountant. Provided, however, that in the event that an income tax assessment is made or criminal prosecution is brought against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment or conclusion of the prosecution." 735 ILCS 5/13-214.2(b) (West 2008).

"Such action," in the first sentence of subsection (b), refers to the action described in subsection (a) (735 ILCS 5/13-214.2(a) (West 2008)): an "[a]ction[] based upon tort, contract or otherwise against any person, partnership or corporation registered pursuant to the Illinois Public Accounting Act, as amended [(225 ILCS 450/0.01 through 32 (West 2008))], or any of its employees, partners, members, officers or shareholders, for an act or omission in the performance of professional services." "In no event" may one bring such an action more than five years after the commission of the accounting malpractice.

The adverbial phrase "in no event," together with the lack of any reference to accrual or knowledge, signals that section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)) is a statute of repose. In a statute of repose, the legislature intends to end the

possibility of liability after the passage of a certain period of time, regardless of when--if ever--the cause of action accrued. *Goodman v. Harbor Market, Ltd.*, 278 Ill. App. 3d 684, 690-91, 663 N.E.2d 13, 18 (1995). In this respect, a statute of repose is different from a statute of limitations. Whereas a statute of limitations does not start running until the cause of action accrues and a cause of action does not accrue until there is an actual injury, the existence of an injury is irrelevant to a statute of repose. A statute of repose runs regardless of the nonexistence of an injury. *Goodman*, 278 Ill. App. 3d at 691, 663 N.E.2d at 18. "A statute of repose terminates the right to bring an action when the event giving rise to the cause of action"--for example, an injury--"does not transpire within the specified interval. The injured party no longer has a recognized right of action ***." *Id.*

Grant Thornton contends that by operation of the statute of repose in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)), plaintiffs' right of action against it terminated in April 2006. Grant Thornton prepared the income tax return for Thermosphere in April 2001. The preparation of the return was the "act or omission alleged in [plaintiffs'] action [against Grant Thornton] to have been the cause of the injury." 735 ILCS 5/13-214.2(b) (West 2008). Five years after that act or omission, in April 2006, the possibility of liability came to an end, so Grant Thornton argues. Plaintiffs filed their complaint in July 2009.

The termination of Grant Thornton's liability three years before the filing of the complaint would be quite simple and straightforward but for the qualification, the "provided" sentence, in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)). Again, that qualification reads as follows: "Provided, however, that in the event that an income

tax assessment is made or criminal prosecution is brought against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment or conclusion of the prosecution."  735 ILCS 5/13-214.2(b) (West 2008).  In the trial court's view, the qualification does not help plaintiffs, because the legislature intended the qualification to "condense" rather than lengthen the five-year period.  Grant Thornton endorses the court's interpretation of the qualification.

The trial court's interpretation might be more convincing if the statute said that the plaintiff "shall" bring the action against the public accountant within two years after the date of the assessment.  Instead, the statute uses the permissive verb "may."  The statute says that the plaintiff "may" bring the action within two years after the assessment--suggesting that notwithstanding the first sentence of section 13-214.2(b), which says that actions against an accountant are barred five years after the harmful act or omission, the plaintiff has permission to bring the action within two years after an assessment.  Permission would be necessary, for purposes of the statute of repose, only if the five-year period in the first sentence of section 13-214.2(b) had expired.

Hence, in our *de novo* reading of section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)) (*Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332, 898 N.E.2d 631, 636 (2008)), we interpret the statute as follows.  For purposes of the liability of an accountant for negligent preparation of a tax return, the five-year period is lengthened to two years after the IRS files the assessment in the office of the Secretary of the Treasury.

But what if the IRS does not file an assessment?  For example, the IRS might perform an audit and on the basis of the audit, issue the taxpayer a notice of deficiency, and

- 74 -

within 90 days after receiving the notice, the taxpayer might pay the full amount of the deficiency specified in the notice. In those circumstances, the IRS surely would not file an assessment. The IRS is prohibited from filing an assessment until the 90-day period has expired (26 U.S.C. §6213(a) (2006)), and if the taxpayer pays the deficiency within those 90 days, there would be no assessment, because there no longer would be any deficiency to assess.

The only difference between the taxpayer who paid the deficiency within the 90-day period, thereby obviating an assessment, and a taxpayer who did not pay during the 90-day period, thereby triggering an assessment, is that the former taxpayer settled with the IRS. It would be unreasonable to suppose that the General Assembly intended to penalize the settling taxpayer by making the qualification in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)) unavailable to that taxpayer while making the qualification available to the taxpayer who refused to pay the deficiency during the 90-day period, making it necessary for the IRS to file an assessment. In our interpretation of statutes, we should try to avoid ascribing to the legislature an intent to bring about absurd, unjust, or unreasonable outcomes. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 558-59, 905 N.E.2d 831, 838 (2009). Therefore, we interpret the qualification in section 13-214.2(b) as meaning that the taxpayer must bring suit within two years after the assessment or, if there is an assessment proceeding that ends in a settlement without assessment, within two years after the settlement. In other words, "assessment" includes the conclusion of the assessment proceeding by settlement with the IRS, short of assessment.

Grant Thornton might object that by drawing this implication from section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)), we are disregarding a rule of construction. In its brief, Grant Thornton cites *Wheeler v. Wheeler*, 134 Ill. 522, 530, 25 N.E. 588, 590 (1890), for the proposition that "[a]ny exception to a statute of repose is to be strictly construed." The qualification in subsection (b), however, is not an "exception to a statute of repose"; rather, it *is* a statute of repose. While qualifying the first sentence of subsection (b), it also extinguishes the possibility of liability: two years after the assessment marks the termination of a right of action.

Besides, "strict construction" is not synonymous with a cramped or unreasonably narrow construction. It is not the extreme opposite of a "liberal construction." *Franklin County Coal Co. v. Ames*, 359 Ill. 178, 181, 194 N.E. 268, 269 (1934). "It does not consist in giving words the narrowest possible meaning of which they are susceptible." *Id.* Instead, when we strictly construe a statute, we merely confine our construction to "such subjects or applications as are obviously within its terms and purposes." *City of Elmhurst v. Buettgen*, 394 Ill. 248, 253, 68 N.E.2d 278, 282 (1946). Strict construction "does not require such an unreasonably technical construction that the words used cannot be given their fair and sensible meaning in accord with the obvious intent of the legislature." *Id.* Instead of confining ourselves to the narrow, technical meaning of "assessment," we infer, by necessary corollary, that "assessment" includes the conclusion of assessment proceedings by a settlement that obviates the filing of an assessment. By so interpreting section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)), we are not bringing in subjects or applications that are outside its terms and purposes.

b. The Negligently Prepared Tax Return Need Not Be the Plaintiff's

Grant Thornton argues that in order for the qualification (the second sentence) in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)) to be applicable, the accountant had to prepare the plaintiff's return and the IRS had to make an assessment against the plaintiff. Because Grant Thornton prepared Thermosphere's return instead of the Khans' return and because the IRS commenced assessment proceedings against the Khans instead of against Thermosphere, Grant Thornton maintains that the qualification in section 13-214.2(b) is inapplicable to the Khans. By preparing the return for Thermosphere, however, Grant Thornton had input into the Khans' returns, because the losses flowed through the partnership to the partners, the Khans.

Besides, the statute does not say that the return has to be the injured person's return. The qualification in section 13-214.2(b) merely says: "[I]n the event that an income tax assessment is made *** against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment ***." 735 ILCS 5/13-214.2(b) (West 2008). The statute says "the tax return," not "the person's tax return." The legislature must have been aware that the negligent preparation of a partnership's return can cause individual returns to be incorrect and result in assessment proceedings against individuals.

According to the complaint, the IRS initiated assessment proceedings in 2003 by issuing notices of audit to plaintiffs. Construing the complaint in a light most favorable to plaintiffs, we understand plaintiffs as alleging that the assessment proceedings came to an unfavorable conclusion in 2008. (If that is not the case--if assessment proceedings are

still pending--Grant Thornton is free, on remand, to move for dismissal of the action without prejudice on the ground of a lack of ripeness.)  Pursuant, then, to the qualification in section 13-214.2(b) (735 ILCS 5/13-214.2(b) (West 2008)), plaintiffs had two years after 2008 to bring their action.  They filed their complaint in July 2009.  Hence, the statute of repose in section 13-214.2(b) does not bar their action.

## III. CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment in the two cases and remand the cases for further proceedings.

Reversed and remanded.